Wachtler, J.
On September 28, 1971, Oscar Sunshine, the ailing president of Modern Pillow, Inc. (Modern) gave his wife Elizabeth a signed check from Modern drawn on Bankers Trust Company (Bank). He allegedly told her to fill in the check for whatever amount she needed. That night Elizabeth inserted her name and the amount ($10,000), thus completing the check (see Uniform Commercial Code, § 3-115, subd. [1]). Soon thereafter Oscar died. On November 11, 1971, Elizabeth deposited the duly indorsed check in her special checking account at the Bank, the same branch on which the check was drawn. The same day, Melvin Sunshine, who was now president of Modern, put a stop order on the check, claiming his stepmother, Elizabeth, had obtained the check by chicanery. Initially, the Bank did nothing to withdraw the provisional credit given Elizabeth. Two or three banking days after the Bank had credited her account and received the stop order from Melvin, the Bank debited Elizabeth’s account. Elizabeth com *408 menced suit against the Bank to recover the $10,000 charge back. The Bank impleaded Modern and issue was joined.
The trial court denied Elizabeth’s motion for summary judgment but granted summary judgment in favor of Modern against the Bank. Elizabeth appealed the refusal of the trial court to grant summary judgment; however the Bank did not appeal the court’s granting of summary judgment to Modern. And the Bank’s motion to have that unappealed judgment reopened at Special Term was denied.
The Appellate Division, First Department, unanimously modified the order of the trial court and granted summary judgment to Elizabeth. The Bank appeals from that decision and attempts as well to have its case against Modern reinstated by this court.
The Bank’s initial contention is that this court should revive its cause of action against Modern (see CPLR 5015, subd. [a], par. 5). Since a determination of the issue relating to the unappealed judgment is crucial to our consideration of issues between the parties in this case, we would but point out that Special Term was correct as a matter of law in denying the Bank’s attempt to reinstitute its action against Modern. This is so since the judgment sought to be reopened was not “ based ” on the prior determination (5 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 5015.11).
The Bank’s primary assault is on the summary judgment granted to Elizabeth by the Appellate Division. Although the pleadings are confusing, a close reading of all the papers before the trial court discloses that there are triable issues of fact.
Initially, it is important to note that the Bank in this case was both the depository and payor bank. The Bank asserts that payment was .not final to Elizabeth based, inter alia, on subdivision (1) of section 4-212 of the Uniform Commercial Code. The “ reasonable time ” provision of that section applies to collecting banks. The mitigating circumstances in that section' (see, also, § 4-108) are not available to the Bank in this case. The code specifically defines a collecting bank as any bank handling an item for collection except a payor bank (see § 4-105, subd. [d]). The Bank, therefore, cannot claim defenses available to a collecting bank relating to final pay *409 ment or breach of presentment warranty (see § 4-207, subd. [2]) as it has attempted to do.
The pertinent code section to determine when the depository bank which is also the payor bank may charge back an account is subdivision (3) of section 4-212. That section allows a bank to obtain a refund for its provisional credit in accordance with subdivision (2) of section 4-301 provided the bank acts within the time limits prescribed by subdivision (1) of section 4r-301. Subdivision (1) of section 4-301 states the bank must return the item or give written notice of dishonor “ before it has made final payment (subsection [1] of Section 4-213) and before its midnight deadline ” or it may not 11 revoke.the settlement and recover any payment ” pursuant to that section. The midnight deadline is the banking day following the banking day the bank receives the relevant item (see Uniform Commercial Code, § 4-104, subd. [h]). If the item is not returned or dishonored within that time limit, the item becomes available for withdrawal as of right “ at the opening of the bank’s second banking day following receipt of the item ” (Uniform Commercial Code, § 4-213, subd. [4], par. [b]). In the case at bar, the bank did not send notice of dishonor until at least three banking days following receipt of the item. The item was therefore available for withdrawal as of right by Elizabeth.
The Bank asserts, inter alia, that it had the right to charge back Elizabeth’s account pursuant to agreements between the Bank and the depositor which superseded the code provisions. The Bank specifically refers to the Regulations Governing Special Check Accounts which Elizabeth signed when she opened her checking accounts.
The agreement states: “ If claim is made to the bank for the recovery of any part of any collected items (including any item cashed for depositor) after final payment thereof, on the ground that such item was altered or bore a forged endorsement or was otherwise not properly payable, the Bank may withhold the amount thereof from the account until final determination of such claim.”
The deposit slip states: “ All items are credited subject to final collection and receipt of proceeds in cash or by unconditional credit to and accepted by Bankers Trust Company.” These agreements appear to refer to the Bank’s role as depos *410 itory or collecting bank and thus would attempt to alter its obligations under subdivision (3) of section dr-213 rather than under section 4-302.
To the extent that either of the agreements attempts to extend the period during which the Bank can charge back a depositor’s account in a situation such as the one before us now, they are invalid.
Appellant cites subdivision (1) of section A-103 of the code which states that “ parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable ”. But appellant fails to cite the caveat in that provision which states “ except that no agreement can disclaim a bank’s responsibility for its own lack of good faith or failure to exercise ordinary care ”. The Official Comment to that code section states (McKinney’s Cons. Laws of N. Y., Book 62%, Part 2, Uniform Commercial Code, p. 519): “ In view of the technicological complexities of the field of bank collections, the enormous number of items handled by banks, the certainty that there will be variations from the normal * * * in each bank, the certainty of changing conditions and the possibility of developing improved methods of collection to speed the process, it would be unwise to freeze present methods of operation by mandatory statutory rules ”. There is nothing in the comment that even hints at an intention to allow banks to alter code provisions in order to render themselves harmless from their own error. "Whatever the validity of bank disclaimers to customers in general or attempts to render themselves harmless from the results of someone else’s errors or disputes,[1] it is clear that here the Bank is attempting to disclaim its own responsibility for ordinary care.
The next issue presented is whether there is a triable issue of fact as to Elizabeth’s alleged breach of warranty of presentment. Even if the bank has initially lost its right to charge back, it can hold the depositor accountable for an item if the depositor committed a breach of presentment warranty (see *411 Uniform Commercial Code, § 4-302). We find however no facts alleged which would support a theory of breach presentment warranty.[2]
Another remedy appellant attempts to pursue is that of subrogation. Section 4r-407 of the code states that: “ If a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights # * * (c) of the drawer or maker against the payee * * * with respect to the transaction out of which the item arose.” The papers before the trial court *412 were replete with allegations of fraud, lack of authority, and other allegations that would give rise to a cause of action by Modern against Elizabeth. The Bank specifically claimed the right to be subrogated to Modern’s claims against Elizabeth in the affidavit of its vice-president opposing the summary judgment motion.
Respondent does not deny that normally the Bank would be subrogated to Modern’s rights, but claims such rights do not arise in this case for two reasons.
First, respondent points out that the Bank never debited Modern’s account. Therefore, it is alleged, Modern suffered no loss to which the Bank can be subrogated. Technically respondent’s argument is colorable. Section 4-407 allows subrogation “ under circumstances giving a basis for objection by the drawer or maker ”.[3] The “drawer or maker ”, Modern, in this case had no basis for objection since its account was never debited. In addition the Official Comment to section 4-407 (subd. [c]) talks of the bank “ reimburs [ing] the drawer for suéh payment ”. There was no reimbursement here since the account was never debited.
The policy arguments regarding the proof that the subrogor has some basis for objection compel a liberal rather than strict interpretation of the pertinent wording of section 4-407. When a stop-payment order has been timely given, the party issuing the order should not lose the use of its funds. Yet, if we were to accept respondent’s argument, the bank would be compelled to debit the account of the party issuing the stop payment as a precondition for suing as a subrogee of that party. The “ innocent ” party who issued the timely stop-payment order would then lose the use of those funds for some time. Certainly the court should not compel a bank to, in effect, wrongfully *413 convert a customer’s fund in order to vindicate its subrogation rights.[4]
Moreover, if we were to compel a bank to debit Modern’s account as a condition precedent to bringing suit, the transaction would merely be a sham directed by this court in order to enable form to triumph over substance. The “ loss ” which will serve as the predicate for the subrogation suit will really be an ersatz loss because a party issuing a timely stop order cannot suffer a legal loss by way of an account debit.
The second allegation raised by respondent concerning the subrogation issue is more bothersome. Respondent asserts that since the summary judgment granted Modern against the Bank is final and nonvacatable, Modern can never suffer any loss, and thus, the Bank has no rights to which it can be subrogated.
It cannot be gainsaid that the decision of the trial court in granting summary judgment to Modern appeared to be quite broad in its application. The court stated that since the stop-payment order was timely Modern “ [could] in no way be liable to [the] Bank ”. There is no doubt that this wording would be broad enough to prevent a suit against Modern by the Bank should it lose its action against Elizabeth (but see § 4-407, subd. [b]).[5] The question is considerably more difficult when *414 determining whether the trial court judgment forecloses the Bank’s rights as subrogee of Modern.
Respondent asserts that the trial court decision forecloses the possibility of the Bank debiting Modern’s account in the future to acquire the necessary prerequisite to bring suit as Modern’s subrogee. The factual basis for this contention appears correct, but as we have noted above such a debit is not a condition precedent to a subrogation action.
We read the trial court decision as barring the possibility of the Bank ever recovering against Modern in a suit arising out of the underlying transaction or occurrence. However, it did not prevent the Bank from recovering against Elizabeth by asserting its own rights under the code or Modern’s rights under the code subrogation provision.
In short, we read section 4-407 as conferring on the Bank the substantive rights of subrogation even if the technical mechanical requirements of common-law subrogation have not been met.[6]
Section 4-407 also contains a provision that allows a bank to recover only to the extent that the party the bank is moving against has been unjustly enriched. In the case at bar, we have held that Elizabeth should be awarded summary judgment on the charge back issue. Hence the money is now hers subject to recovery by the Bank qua subrogee of Modern. Her award, however, should be stayed pursuant to CPLR 3212 (subd. [e], *415 par. 2) to make certain the money is still extant and collectible should the Bank later prevail on the subrogation issue.[7]
There is one last assertion by respondent that deserves the attention of this court. Banks are in the unique position of holding the very stakes for which they are contending. Respondent asserts that if we send this case back for trial, we would in effect, allow the Bank to be the arbiter of a dispute between two outside parties. We are not unmindful that banks may, perhaps even under a colorable claim of right, charge back a depositor’s account even when no such right exists. The burden on a depositor of then going forward to bring a suit is a heavy one, and, indeed, an impossible one to bear where the amount involved is small. Our decision should not be interpreted to permit this result. Before payment becomes final, or the midnight deadline has passed, a bank may charge back an account when it has received a timely stop order precisely so the Bank can avoid taking part in the dispute at all. However, once the Bank loses its right to charge back, the item becomes comingled with the general funds of the depositor (see 622 West 113th St. Corp. v. Chemical Bank N. Y. Trust Co., 52 Misc 2d 444). When the Bank is suing as subrogee, it may not at the same time make a preliminary determination of the merits of the case by charging back on the depositor’s account (cf. Banking Law, § 134, subd. 5). So that in this case the Bank has no more or less right to take away or freeze Elizabeth’s account than would the Bank’s subrogor,' Modern.[8] When the Bank is acting as subrogee, it has the burden of going forward.
*416 In sum then, we find that there are triable issues of fact relating to the allegations surrounding the underlying transactions raised by the Bank qua subrogee of Modern. Accordingly the case should be remanded to the trial court for a trial of these issues.

. As would be the case if the “ agreement ” was interpreted as an attempt to alter the provisions of subdivision (3) of section 4-213 of the Uniform Commercial Code.

. The “good title” warranty in section 4-207 (subd. [1], par. [a]) appears to apply mainly to forged indorsements and would not be applicable in this case. There is no allegation of a forged indorsement. We do not construe the warranty that the item has not been materially altered (subd. [1], par. [c]) as covering a ease where an item has allegedly been fraudulently obtained. Since there is no allegation that Elizabeth filled in an amount other than that authorized by her husband, this provision would not apply to the case at bar.
Section 4r-207 (subd. [1], par. [b]), the warranty that Elizabeth had no knowledge that Oscar’s signature was unauthorized, is a bit more bothersome. The third-party counterclaim filed by Modern, and available for use by the Bank (see 622 West 113th St. Corp. v. Chemical Bank N. Y. Trust Co., 52 Misc 2d 444) asserts lack of authority by Oscar to sign the check for Elizabeth’s personal use (see Wen Koy Realty Co. v. Public Nat. Bank & Trust Co. of N. Y., 260 N. Y. 84). However, paragraph (b) of subdivision (1) refers to the signature being unauthorized not the instrument being unauthorized. There is no doubt that Oscar’s signature was authorized (i.e., he had authority as president of Modern to sign checks for Modern). Section 3-417 of the code is a parallel of section 4-207 (McKinney’s Cons. Laws of N. Y., Book 62%, Part 2, Uniform Commercial Code, Clarke and Young, Practice Commentary, p. 564). The Official Comments to section 3-417 of the code support the assertion that “ authorized signature ” means only what it says and was not meant to include unauthorized purpose. Official Comment No. 4 talks of “parties accepting or paying instruments bearing unauthorized maker’s or drawer’s signatures” (emphasis added, p. 356). And further on, the comment talks of the “ drawee who accepted without detecting the unauthorized signature ” (p. 358). That phrase certainly appears to refer to an examination of the signature only and not the purpose for which the instrument was given. Therefore, we conclude that the Bank has not stated an affirmative defense under section 4-207.

. If we were to read the phrase “ giving a basis for objection by the drawer or maker ” as modifying the phrase “ otherwise under circumstances ” only and not the phrase “ over the stop payment order of the drawer or maker ”, there would be no need to require a basis for objection by the drawer of maker as a predicate to recovering under this section in this case. Inserting, in effect, a comma after the word “Maker” in the first sentence of section 4-407 would not be unreasonable, but our conclusion for policy reasons would come out the same even if we read “ giving a basis for objection ” as modifying everything that comes before it in the sentence {infra).

. In most cases, we realize, the Bank will inadvertently debit Modern’s account until it realizes a timely stop order has been issued. We should not exacerbate that unfortunate situation by compelling a bank to debit the account even after it realizes a timely stop-payment order has been issued.

. The questions of whether, absent the trial court’s decision, the Bank could sue Modem under subdivision (b) of section 4-407 of the code is not before this court, and we therefore do not reach it. However, it should be pointed out that an implicit assertion underlying many of appellant’s arguments is that a bank cannot be made to suffer a loss by paying over a timely stop order. Usually, the code provides the Bank with a means of recouping any loss it has suffered, but this is by no means always the case. The Official Comment to section 4-403 of the code (McKinney’s Cons. Laws of N. Y., Book 62%, Part 2, Uniform Commercial Code, p. 611) makes clear that a stop-payment order need not be supported by a sound legal basis; it is, instead, a service that must be provided by the banking industry: “2. The position taken by this section is that stopping payment is a. service which depositors expect and are entitled to receive from banks notwithstanding its difficulty, inconvenience and expense. The inevitable occasional losses through failure to stop should be borne by the banks as a cost of the business of banking ”.

. Although there appeared to have been no cases directly in point, in 1955 the Law Revision Commission stated that in a situation such as the one at bar, New York allowed the Bank to recover on a common-law restitution theory rather than a subrogation theory (see 1955 Report of N. Y. Law Rev. Comm., Study of the Uniform Commercial Code, vol. 2, pp. 1558-1559). Whatever the continued viability of a common-law restitution theory in connection with other parts of the code or on a different fact pattern, it appears that such a theory has been subsumed by section 4-407 of the code in this ease. If we had required an account debit as a precondition to a section 4r-407 suit, or if we had, in effect, read section 4-407 out of the code by prohibiting an account debit but requiring Modern to suffer some loss, then it is clear that the common-law right of restitution would not have merged into the code provision. But if we allow the Bank a separate cause of action for common-law restitution in the case at bar, we would be allowing it two bites of the same apple.

. Whenever a bank is relying on a right of charge back and a subrogation right, it should always plead in the alternative. A court should always decide, and the parties should always litigate the charge back issue first. Then, in the event the bank loses on the charge back issue, the claimant will have been (“unjustly”) enriched, and the bank will be able to proceed with its subrogation action. When a verdict is returned simultaneously on both the charge back and the subrogation issue, it will be assumed that the charge back issue was determined first. Such procedures are necessary because the bank can hardly claim an opposing party has been unjustly enriched when the bank is holding the funds in question under color of right.

. This, of course, should in no way prevent a bank from obtaining an attachment of the funds or otherwise freezing them in any manner available to it under the law.