OPINION OF THE COURT
John Manning Regan, J.
There are no controverted questions of fact between the parties to this action in respect to any material issue. Accordingly, this motion for summary judgment presents solely a question of law, and this court should, and will, proceed to judgment. (CPLR 3212 [b].)[1]
*210 Plaintiffs, Dr. and Mrs. Frederick Hughes, are depositors in the defendant, Marine Midland’s, bank. They have transacted banking with the defendant at its office on East Avenue in Rochester, New York, for some years.
In February 1983 the plaintiffs were on vacation in Sarasota, Florida. In Sarasota, they leased a resort cottage from Diane Barth, a real estate agent. Ms. Barth insisted, prior to granting possession of the cottage, that the plaintiffs pay the full month’s rental of the property in the sum of $1,470. Mrs. Hughes tendered her personal check, dated February 1,1983, for the sum of $1,470 to Ms. Barth in compliance with her preconditions. The check was drawn on defendant bank’s East Avenue, Rochester, New York, office from the Hughes’ personal joint account. Ms. Barth deposited the check in the First Presidential Savings & Loan of Sarasota the very next day, February 2, 1983, for collection.
On February 4, 1983, a Friday, Dr. Hughes telephoned the defendant bank and spoke with Gail Stevens, a bank employee, whose duties as an operations supervisor included the processing of telephoned stop-payment orders.[2] Dr. Hughes told Ms. Stevens the correct account number, the correct name of the payee, the correct date of the check, and the correct amount of money for which the check was drawn. He did not give her the correct check number, however, describing the number as 292 instead of 280.
Moreover, Dr. Hughes amplified his stop-payment telephone call with his reasons for stopping payment. He advised that the payee, Ms. Barth, had misrepresented the quality of the accommodations for which the check had been delivered to her, whereupon Ms. Stevens duly recorded “misrepresentation” as the reason for the stop order.
This telephone call was placed at 8:55 a.m. on Friday, the 4th day of February 1983. On Monday, February 7,1983, the Barth check was posted as a debit to the Hughes’ account, and the full sum of $1,470 was deducted.
In reliance on the conversation with Ms. Stevens, Dr. Hughes notified Ms. Barth that he and his wife were leaving the premises. After contentious arguments had ended, the Hughes paid Ms. Barth the sum of $350 later that same Friday afternoon, February 4,1983, in full settlement of all claims between them.
*211 The bank sent the Hughes a form for written confirmation of the stop-payment order and Dr. Hughes returned it, duly signed, to the bank on February 18, 1983. On February 22, 1983, the bank mailed the plaintiffs their monthly statement which showed the $1,470 deduction for the Barth check on February 7, 1983. When they received the statement some three days later, they learned, for the first time, that the bank had not honored their stop-payment order.
The Hughes’ cause of action asserts that the bank is liable to them for this loss of $1,470 under the provisions of UCC, article 4, § 4-403, which reads as follows:
“(1) A customer may by order to his bank stop payment of any item payable for his account but the order must be received at such time and in such manner as to afford the bank a reasonable opportunity to act on it prior to any action by the bank with respect to the item described in Section 4-303.
“(2) An oral order is binding upon the bank only for fourteen calendar days unless confirmed in writing within that period. A written order is effective for only six months unless renewed in writing.
“(3) The burden of establishing the fact and amount of loss resulting from the payment of an item contrary to a binding stop payment order is on the customer.”
The bank’s answer does not contain a general denial. It selects certain allegations in the complaint for specific denials upon information and belief. However, the affidavits and documentary proof have convincingly established the above facts.
In addition, the answer pleads four affirmative defenses — failure to state a cause of action, contributory negligence, a defense labeled “the complaint is subject to rebuttal by documentary evidence”, and forum non conveniens (CPLR 327).
The bank’s principal defenses to plaintiffs’ assertion of liability is that the bank’s actions did not cause the loss, but, rather, the plaintiffs’ error did, for when plaintiffs gave Ms. Stevens the wrong check number, the bank’s computer correctly reported that check number 292 had not been negotiated, and thereafter payment of check number 292 was, in fact, stopped. But, of course, payment of check number 280 was not stopped.
The bank has also pleaded a novel procedural defense. They have urged this court to forego jurisdiction under CPLR 327, forum non conveniens, on the grounds that because this court has no in personam jurisdiction over Diane Barth, a resident of Sarasota, Florida, the plaintiffs should be relegated to a Florida *212 forum. Furthermore, the defendant points out that, under the Florida UCC, article 4, § 674.4-403 (1) requires stop-payment orders to describe the check “with certainty”, and that supplying the wrong check number is fatal. Finally, they argue that this case has more significant contacts with Florida and involves interpretations of a Florida realty contract, questions as to which this New York forum has neither jurisdiction nor competence to decide.
i
THE PLAINTIFFS’ CAUSE OF ACTION UNDER UCC 4-403
Since Dr. Hughes and his wife are residents of New York, and they live in Monroe County, and since the defendant bank owns and operates a branch bank in Rochester, on East Avenue, and since the banking contract between these parties was made in Rochester, and the debtor-creditor relationship it created is to be performed in Rochester, New York law will govern the legal incidents of that debtor-creditor relationship and will determine whatever liability the bank may have. (UCC 1-105 [1]; 4-102 [2]; Auten v Auten, 308 NY 155 [1954].)
Because the bank received the stop-payment order in plenty of time to act on it,[3] the only flaw in the plaintiffs’ case is the error they made in providing Ms. Stevens with an incorrect check number. Ms. Stevens’ affidavit states that the bank’s central computer in Syracuse, New York, “can be directed to identify: (1) a specific check by number; (2) all checks for a specific amount; (3) a specific check having a stated number and amount.” Ms. Piper, a bank employee who actually works at the computer center in Syracuse, and whose affidavit states that the center processes almost a million items a day, reports that any stop-payment order can be processed in any of three ways: “(1) by check number and dollar amount (2) by check number, or (3) by dollar amount.”
From these circumstances, it is evident that the bank’s intraoffice memorandum, which Ms. Stevens made from her conversation with Dr. Hughes over the telephone on February 4,1983, contained enough information — the account number, and the amount of the check — to process the stop-payment order at the computer center in Syracuse.
The legal question then becomes whether these facts meet the standards of legal sufficiency set out in UCC 4-403 (1) which are *213 that: “the order must be received at such time and in such manner as to afford the bank a reasonable opportunity to act”. The case law is not easily reconciled. In Mitchell v Security Bank (85 Misc 360 [App Term, 1st Dept 1914]), a wrong date, and a single-digit error in the amount of the check was held insufficient. Yet in Thomas v Marine Midland Tinkers Natl. Bank (86 Misc 2d 284, 287 [Civ Ct, NY County 1976]), a digit error in the check number was deemed “trivial and insignificant”, and the check description held to be adequate.
In view of the Thomas decision (supra) in 1976, and recognizing the capabilities of modern computers to respond to programmed software, the court concludes that New York banks have had ample time to design software to identify and stop payment on checks from a specific account simply by account number and dollar amount. In fact, Ms. Piper’s affidavit admits that Marine’s computers now have that capability. Accordingly, in the interests of commercial stability and predictability, and in furtherance of the doctrine of stare decisis,[4] this court will follow the rule in Thomas and hold that the information provided met the statutory standards of reasonable accuracy, and did therefore provide a reasonable opportunity for the bank to act.
UCC 4-403 (3) puts the burden of establishing the fact and amount of loss occurring upon payment over a valid stop order on the customer. At first glance, most would infer that this loss would always be equal to the face amount of the check, and that deducting that face sum from the customer’s account would establish that sum as “the amount of the loss”. For example, the complaint in this case makes that assumption and demands judgment for $1,470, the sum defendant deducted from the account.
Prior to enactment of the UCC, this was the law in New York. Unless a customer ratified, and adopted as correct, the bank’s wrongful payment over a valid stop order, the bank was liable for the full sum deducted from a customer’s account (Chase Natl. Bank v Battat, 297 NY 185 [1948].) Moreover, the court specifically held in Battat that the validity or invalidity of the underlying transaction was no defense to the customer’s cause of action: “ Tn the absence of ratification the bank [zs] liable to the depositor, as [a bank cannot] justify paying out the depositor’s money *214 without authority by showing that the recipient [payee] was justly entitled to it.’ ” (297 NY, at p 190, citing American Defense Socy. v Sherman Natl. Bank, 225 NY 506 [1919].)
In post-Code cases in New York,. particularly in Thomas v Marine Midland Tinkers Natl. Bank (supra), and, obliquely, in Sunshine v Bankers Trust Co. (34 NY2d 404 [1974]), that issue has become muddled.[5]
Thomas (supra) regards the problem as a conflict between UCC 4-403 (3) and 4-407 (the subrogation provisions) and holds, under the authority of Sunshine (supra) that the plaintiff must prove, as part of his case, that the underlying transaction caused a loss so long as the bank’s answer raises that issue; and the bank adduces some evidence of that fact. Much of this rationale is dicta, however, because the bank in Thomas did not plead, nor prove, any affirmative defense as to nonloss (see, 86 Misc 2d, at p 291.)
In the instant case, the bank has pleaded forum non conveniens both as a procedural and affirmative defense. In its affidavits and briefs, it has argued that the underlying transaction with Barth raises factual questions about whether the plaintiffs truly sustained a loss, and, if so, what the amount of that loss was.
This court agrees with the bank to this extent: if the underlying transaction is part of the plaintiff’s case — as Thomas (supra) says it is — then the bank has raised a factual issue in this case, and summary judgment should be denied. However, Thomas cannot bind this court in the face of both common sense and the holding of the Court of Appeals in both American Defense Socy. and the Battat cases (supra). Sunshine did not overrule either American Defense Socy. or Battat, explicitly or implicitly, and, moreover, unequivocally, Sunshine still held that: “a stop-payment order need not be supported by a sound legal basis”. (See, 34 NY2d, at p 413, n 5.)
Therefore, in this court’s judgment, Battat (supra) is still good law in New York; and a bank may not defend a UCC 4-403 *215 violation by pleading that the payee of the check, which was the subject of a valid stop order, was justly entitled to the money. Further, the payee Ms. Barth’s entitlements, if any, are not a part of the plaintiffs’ prima facie case. This court now holds that the plaintiffs meet their burden to prove loss both under the common law and under the Code, if they show that the bank has paid out from the depositor’s account a sum of money over a valid stop order, and the loss, both prima facie, and at trial, is that sum so paid out.[6]
*216 Common sense precludes involving banking institutions in litigation among their customers and those with whom their customers deal. The bank’s contract obligations with their customers are separate and distinct from the commercial transactions which the customers may have with others. In granting subrogation rights to any bank which has sustained a loss due to a wrongful payment over a valid stop order, the Legislature in UCC 4-407 gave a method of mitigating such losses, if a bank chose to exercise such rights. The analogy to an insurance subrogation — where the carrier must pay the insured upon the event of loss — is apposite and comparable. The carrier can sue the guilty party — and it frequently does; but that option bears no relationship to the carrier’s duty to pay its insured under its insurance contract on a proper proof of loss.[7] Here the debtor-creditor contract between the Hughes and the bank governs the bank’s liability. The bank’s subrogation rights, after it has experienced a liability for its breach of that debtor-creditor contract, are irrelevant.
Sunshine (supra) is not contrary to this holding. That case holds that regardless of whether the underlying transaction between the bank’s customer and a third party is valid or invalid, and regardless of whether the depositor himself has sustained a loss, subrogation (the equitable transfer of legal rights from one person to another) occurs when the bank has sustained a loss.
If the underlying transaction were an ingredient of the UCC 4-403 claim, then the UCC 4-403 action would subsume the underlying transaction and UCC 4-407 (b) and (c), the subrogation statute, would become superfluous since the underlying transaction would always be litigated in the UCC 4-403 suit, because the parties in the underlying transaction would be necessary (CPLR 1001) to any depositor’s prima facie case. The effect of any such rule would be to merge these statutes into a single cause of action.
*217 Sunshine (34 NY2d 404, supra), however, recognizes separate causes of action: One by the customer against the bank under UCC 4-403, and one by the bank, as subrogee, against the payee under UCC 4-407 (c). In footnote 5 on page 413, the Court of Appeals candidly admits that the finality of the trial court’s order precluded their consideration of the cause of action under UCC 4-407 (b) against the depositor-maker, but their implication is that such a cause of action, as that statute gives, does exist.
Moreover, the cases contain two persuasive reasons for recognizing this sequential separateness of these causes of action: (1) The “innocent” party who has issued a timely stop-payment order is entitled to the use of his funds pending the determination of his legal obligations in the underlying transaction; and (2) the cost of prosecuting the suit on the underlying transaction may exceed the maximum possible recovery, and it may never be brought. In such event, the bank must bear the loss as a cost of doing business. (See, 34 NY2d, at p 413, n 5.)
This court understands that this holding allows a depositor plaintiff possibly to become a third-party defendant in his own UCC 4-403 action. In such an action, the defendant bank can, and sometimes surely will prosecute its subrogation claims, under UCC 4-407 (b) and (c) in a third-party suit against both its depositor and the person with whom the depositor has had an underlying transaction. But that possible procedural posture should not, and does not, affect or alter the substantive legal relationships among all these parties, nor ought it to confuse and merge the sequential separateness of the causes of action each of these statutes has created.
n
THE bank’s AFFIRMATIVE DEFENSES
The affirmative defenses of failure to state a cause of action, contributory negligence and “rebuttal by documentary evidence” are all dismissed on the law and the findings of fact set out above.
The affirmative defense of forum non conveniens deserves comment. If UCC 4-403 (3) did impose upon a plaintiff the duty to prove that the underlying transactions had, in fact and law, caused him a loss, then in this case Diane Barth would become a necessary party. (CPLR 1001.) In such an eventuality, CPLR 1001 (b)[8] and 327 as well would practically combine to compel a dismissal without prejudice.
*218 However, since UCC 4-403 (3) does not require that proof of the underlying transaction’s validity be adduced in the plaintiff’s Case, and since both Battat and American Defense Socy. decisions (supra) of our Court of Appeals foreclose these questions as affirmative defenses to the bank, New York is the appropriate forum to decide the substantive legal issues between the parties to this action in respect to their depository contract and its mutual obligations.
For the same reasons, it is clear that this determination will have no res judicata effect whatsoever, either for or against the bank, or Dr. Hughes, or their assignees, or subrogees, in respect to the underlying transaction between Dr. Hughes and Ms. Barth, in direct, or in subrogation actions under UCC 4-407 (b) and (c).
The order in this action should contain, in addition to the itemizations of the affidavits and pleadings submitted on the motion, a decretal paragraph specifically keeping open all issues pertaining to the underlying transaction, in order to eliminate any possible misunderstanding by any Florida court which may have occasion to hear that case that this New York judgment does not preclude any of the issues any party may wish to plea in • respect to that underlying transaction litigation.
m
ORDER AND JUDGMENT
In view of the foregoing, the court grants the plaintiffs’ motion for summary judgment, and directs entry of a judgment for plaintiffs in the sum of $1,470, with interest at 9% from February 7, 1983, together with the costs and disbursements of this action.

. The statute (CPLR 3212 [b]) provides in pertinent part: “The motion shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party.” By means of this language, any motion for summary judgment incorporates the common-law demurrer rule, that the application “searches the record” and authorizes judgment for either party where no material facts are in dispute. (Cf. O’Neill v City of New York, 13 Misc 2d 1008 [Sup Ct, NY County 1958], affd 9 AD2d 729 [1st Dept 1959], affd 9 NY2d 447 [1961].)

. Ms. Stevens’ sworn affidavit of September 24,1984, attests to these facts and substantially corroborates the moving affidavits of the plaintiffs. Moreover, her affidavit encloses the written intrabank memorandum she made during the telephone conversation which recorded the information as Dr. Hughes gave it to her over the telephone.

. A full banking day, a full weekend, and a portion of the next banking day elapsed before payment. This is time enough to act as a matter of law. (Dunbar v First Natl. Bank, 63 AD2d 755 [3d Dept 1978]; see also, Chute v Bank One, 10 Ohio App 3d 122, 460 NE2d 720 [1983].)

. Other State courts have agreed with the decision in Thomas. (See, Parr v Security Natl. Bank, 680 P2d 648, 38 UCC Rep Serv 275 [1984], reporting a Court of Appeals case from Oklahoma, which held that a digit error in the check number did not vitiate the sufficiency of the stop order.)

. Under the Comments to UCC 4-407 (McKinney’s Consolidated Laws of NY, Book 62(4, UCC 4-407, p 631), the author informs us that the Code drafters were aware that a routine defense to a valid stop-order action was that the underlying debt was due in any event. While this defense was available in some States, it was not in New York. (See, Chase Natl. Bank v Battat, supra.) The New York Annotations (McKinney’s Consolidated Laws of NY, Book 62(4, UCC 4-403, p 613) meekly suggest that UCC 4-403 (3) appears to be “contra” the rule, but they cite no authority for that interpretation, and this court can find none. Certainly, the language itself creates no categorical imperative for such an interpretation.

. The court must here acknowledge that decisions in other States, particularly Florida, are to the contrary. (See, Southeast First Natl. Bank v Atlantic Telec, 389 So 2d 1032 [Fla App 1980], which follows the rules set out in Thomas v Marine Midland Tinkers Natl. Bank, supra.)
Contrary judicial interpretations of UCC 4-403 (3) are the rule, however, not the exception; and Florida and New York are merely examples.
Illustrative of both this conflict and mystery is the recent case of Saratoga Polo Assn. v Adirondack Trust Co. (118 Misc 2d 247 [Sup Ct, Saratoga County 1983]). That court writes: “In the absence of pertinent New York case law, and since the court here is dealing with subdivision (3) of section 4-403 of the [UCC], which has been adopted by several jurisdictions, this court resorts to Mitchell v Republic Bank & Trust Co. (35 NC App 101,104) for guidance.” (See, 118 Misc 2d, at p 249.)
What is peculiar about this reference route (and truly mystifying as well) is that the “guidance” opinion of the North Carolina Appellate Court in the Mitchell case (supra) rests wholly upon the prior decision of New York City Civil Court Judge Egeth in Thomas v Marine Midland Tinkers Natl. Bank (86 Misc 2d 284 [1976], supra). (See, 35 NC App 101, 239 SE2d 867, 869 [1978].) Thomas, of course, was as available as a reference to the Saratoga Polo court (supra), as it was to the Mitchell court (supra), but the opinion in Saratoga distinguishes Thomas away.
Moreover, the court in Saratoga Polo (supra) makes no mention of, nor reference to, the decisions of the Court of Appeals in Battat and American Defense Socy. (supra).
Georgia courts have ruled that the underlying transaction between a depositor and a third party is wholly irrelevant in a UCC 4-403 action between the bank and its depositor based on an improper payment over a valid stop order. (See, Whitmire v Woodbury, 154 Ga App 159, 267 SE2d 783 [1980].)
Massachusetts courts, on the contrary, have espoused the rule enunciated in Thomas v Marine Midland Tinkers Natl. Bank (supra). (See, Siegel v Northeast Merchants Natl. Bank, 386 Mass 672, 437 NE2d 218 [1982], which allows the bank to introduce proof of the underlying transaction on the question of plaintiff’s damages.)
This court’s decision, in the instant case, does not stem from any animadversions to North Carolina, Massachusetts, or Florida courts, the predicates for the instant holding are twofold: (1) Battat, American Defense Socy. and Sunshine (supra) all eschew involvement with the underlying transaction either as part of plaintiff’s damages, or as an affirmative defense, and all three cases bind this court; and (2) absolutely nothing in the Comments to UCC 4-403, nor in the language of subdivision (3) itself, constrains so bizarre and cumbersome an interpretation.
Finally, the law of damages has always been to confine economic losses, not expand them. The direct damages from the breach of the depositor’s contract is *216 the sum wrongfully deducted. The underlying transaction introduces, at least, the issue of consequential damages. Opening that issue may expand a bank’s liability beyond immediate reckoning, and allow plaintiffs to prove that wrongful payment of the stopped item caused a whole series of events far more damaging, financially, than the amount paid out. Excursions of this kind are at war with the conservative history of commercial law and the law of contracts generally.

. While large banks may be self-insurers, many smaller banks insure themselves against both forgeries and collection losses. In those cases, the insurance subrogation process is more than an analogy, it is a fact, as the carrier who pays eventually winds up as the subrogee under UCC 4-407.

. “If jurisdiction over him can be obtained and only by his consent or appearance, the court, when justice requires, may allow the action to proceed *218 without his being made a party. In determining whether to allow the action to proceed, the court shall consider * * *
“2. the prejudice which may accrue from the nonjoinder to the defendant or to the person not joined * * *
“5. whether an effective judgment may be rendered in the absence of the person who is not joined.” (CPLR 1001 [b].)