CYNTHIA HOLCOMB HALL, Circuit Judge,
dissenting:
Today a majority of the panel holds that a bank which fails to dishonor notes by the deadline established by the local clearing house rule and which makes payment on the notes to a holder in due course may recover those payments in cases when the Uniform Commercial Code does not specifically refer to the fact situation involved and when a court determines that it is “equitable” to grant relief. I believe that the Code was intended to provide more concrete guidance for those engaging in commercial paper transactions.
I agree that section 1-103 of the Code provides the background for interpreting other Code provisions and I agree that the equitable principles embodied in that section govern transactions unless displaced. The majority’s definition of “displacement,” however, basically forges a rule that allows courts to disregard Code provisions in the pursuit of their view of equity whenever the letter of the Code leads to a result they view as unpalatable. The majority states the purposes behind the final payment rule of section 3-418 and then engages in a long discourse of how the peculiar and myriad facts of this case weaken or distinguish the policies behind the rule. I have no doubt that courts could engage in this kind of analysis in every case to reach results they find “equitable.” The ultimate result of this process, however, is an unfortunate uncertainty in commercial transactions, an uncertainty that the Code was designed to avoid.
Broad rules intended to guide a large number of commercial transactions reflect policy judgments. Often those judgments require what may seem to be harsh results in individual cases in order to achieve a greater policy objective along with a certainty in law which allows all to conform their conduct to the requirements of the rule. The final payment rule of section 3-418 is no different. This rule is intended to provide for finality in commercial paper transactions so that the integrity of those transactions can be maintained. See 6 R. Anderson, Uniform Commercial Code § 3-418:4, at 412 (3d ed. 1984) (footnote omitted) (“UCC § 3-418 is predicated upon the need for finality and not upon any outdated concept that the drawee bank can carefully examine checks for forgery.”). This policy, and not any factual permutations that might have been considered by the Code’s drafters, designates the point at which notions of equity are supplanted.
The majority believes that, because American knew that Morgan had the right to dishonor the notes, American had a reduced expectation of finality and, as a result, section 3-418 does not apply. I find no indication that the goal of finality to which section 3-418 is directed is at all linked to any expectations of finality of a party to the transaction. The principle is inextricably linked to the expectations not only of the instant parties but to the millions of future parties whose conduct must conform to section 3-418 and who must know its limits to conform to its guidelines. The majority may feel that it has made a small, limited incursion into section 3-418’s domain. Other parties will be left to wonder whether this case is a one-way ticket good for this day and this day only or an indication of other future “limited” incursions.
Sections 3-418 and 4-213 make clear that courts should make no incursion at all. Comment 5 to section 3-418 states (emphasis added):
[The final payment rule] is ... limited by the bank collection provision (Section 4-301) permitting a payor bank to recover a payment improperly paid if it returns the item or sends notice of dishonor within the limited time provided in that section.[1] But notice that the latter right is sharply limited in time, and termi *1502 nates in any case when the bank has made final payment, as defined in Section 4-213.
Section 4-213 of the Code specifies the time at which the right to revoke payment expires. That rule provides (emphasis added):
(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:
(a) paid the item in cash; or
(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or
(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.
The equitable principles of section 1-103 have their place in commercial paper transactions, but those equitable rights expire when the clearing house deadline expires. The Code provided Morgan with a right to recover any money it paid before the deadline so long as the revocation of payment occurred within the time allowed by the clearing house rules. Unfortunately, the provisional settlement in American’s favor became final when the deadline passed.
Any other result renders the language of section 4-213 meaningless. When sections 4-213(l)(b) and (d) speak of revocation, we must assume that they refer to revocation for legitimate reasons, and Morgan certainly had a legitimate reason for revoking any provisional settlement in American’s favor. Morgan had every right to refuse to pay on the note. But even legitimate efforts to revoke have their time limitations, as the plain language of section 4-213 makes apparent. After that time has passed, the policy favoring finality cuts off the equitable rights in order to further the goal of repose. See Perini Corp. v. First National Bank, 553 F.2d 398, 405-06 (5th Cir.1977).
The majority states that it believes the interaction of sections 3-418 and 4-213 can be viewed in either of two ways and that it favors the view that section 4-213 does not extinguish restitutionary rights. Ante at 1499 (citing National Savings and Trust Co. v. Park Corp., 722 F.2d 1303, 1306 (6th Cir.1983), cert. denied, 466 U.S. 939, 104 S.Ct. 1916, 80 L.Ed.2d 464 (1984)). Neither I nor the courts of New York, whose law we are bound to apply, think that the majority’s view of section 4-213 is the better view. A bank that fails “to dishonor the check before the deadline provided by the Uniform Commercial Code and the Rules of the New York Clearing House” may not recover its payment. Fromer Distributors, Inc. v. Bankers Trust Co., 37 A.D.2d 840, 321 N.Y.S.2d 428, 430 (Sup.Ct.1971) (citing U.C.C. §§ 4r-211, 4-213, & 4-301). That payment is final. 321 N.Y.S.2d at 430. See Manufacturers & Traders Trust Co. v. County Trust Region of the Bank, 59 A.D.2d 645, 398 N.Y.S. 298, 298 (Sup.Ct.1977) (citing U.C.C. §§ 4-301 & 4-302). Cf. Security Trust Co. v. First National Bank, 79 Misc.2d 523, 358 N.Y.S.2d 943, 945, 947 (Sup.Ct.1974) (defendant bank not liable on checks since return was timely pursuant to the clearing house rules and proper notice was given under Code).
In Met Frozen Food Corp. v. National Bank of North America, 89 Misc.2d 1033, *1503 393 N.Y.S.2d 643 (Sup.Ct.1977), the court explained the difficult policy decisions accompanying the burdens placed upon payor banks. The requirement that payor banks comply with clearing house rules or face liability for the amount of the notes places those banks in a “precarious position.” 393 N.Y.S.2d at 647. The payor bank “must act and act quickly under rather hectic conditions to protect itself against incurring substantial liabilities. However, the integrity of the entire system of commercial paper itself requires that someone bear a risk. The UCC has quite logically placed the risk upon the obvious party [the payor bank].” Id.[2] Because of the role of the payor bank in the collection process, “ ‘[t]he legislature could have considered that the failure of such a bank to meet its deadline is likely to be due to factors other than negligence, and that the relationship between a payor bank and its customer may so influence its conduct as to cause a conscious disregard of its statutory duty.’ ” Id. at 647-48 (quoting Rock Island Auction Sales v. Empire Packing Co., 32 Ill.2d 269, 273, 204 N.E.2d 721, 723 (1965)).
Finally, the court in Met Frozen Food stated the well-established rule of New York law, that a failure to revoke before the clearing house deadline is, in effect, final payment of the item. 393 N.Y.S.2d at 647. This rule held true even though the bank’s reasons for attempting to dishonor the notes included the bankruptcy of its depositor. Id. at 648.[3]
The Code and its equitable principles demonstrate some sympathy for those payors who make payment on notes they are entitled to dishonor. But that sympathy goes only so far. After the grace period for recovery of mistaken payments has passed and after the time for dishonor under the clearing house rules has lapsed, the goal of finality, if it is to mean anything at all, must take priority. The majority’s rule raises the possibility that a payor may be entitled to recover a mistaken payment months after payment is made. That possibility creates an uncertainty which undermines the goal of finality in commercial paper transactions. The principle of finality, if it is to be achieved, cannot tolerate such results. Further, the majority’s rule *1504 has the effect of rendering the Rules of the New York Clearing House mere verbiage.[4]
The court in Met Frozen Food recognized the significance of destabilizing commercial paper exchanges by weakening the rule of repose.
$14,835,917,339,000 [is] an impressive amount, even in an age of superlatives. It represents the total dollar value of commercial paper cleared through the sixteen Federal Reserve Banks in the major cities of the United States during the 1975 calendar year. In New York City alone, the average daily exchange at the New York Clearing House amounts to $5,642,306,382.51. Each day, then, more than five billion dollars changes hands in the metropolitan area by means of abstract transactions involving bank debits and credits. ... [I]n a functional economy paper is king.
This fluidity of exchange is made possible by the country’s “banking system.” It provides the machinery and the personnel which makes the transfer of funds possible and workable.
393 N.Y.S.2d at 644-45.
There are some areas in which “undefined considerations of equity” have no place. See Butner v. United States, 440 U.S. 48, 56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). The final payment rule is one of those areas. If I take any solace at all from the decision in this case, it is that our rule does not bind the courts of New York which have clearly marked out a better path to follow.
I dissent.

. U.C.C. § 4-301 provides:
(1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection
*1502 (1) of Section 4-213) and before its midnight deadline it
(a) returns the item; or
(b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.
(3) Unless previous notice of dishonor has been sent an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section.
(4) An item is returned:
(a) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules____
Comment 5 to section 4-301 states that if the item has been "finally paid" under section 4-213 (1), then section 4-301 "has no operation.”

. The majority argues that Met Frozen Food is consistent with its holding. Ante at 1496-97. The plain language of the New York court’s opinion rebuts this contention:
It is clear that if the plaintiffs can establish that [the payor bank] failed to timely return a check .. within the deadline set forth in [the Code] ... [the payor bank] is liable for the face amount of the item ... less any payment received (see UCC § 4-213).
393 N.Y.S.2d at 647 (emphasis added) (citing Sunshine v. Bankers Trust Co., 34 N.Y.2d 404, 358 N.Y.S.2d 113, 314 N.E.2d 860 (1974); From-er Distributors, 321 N.Y.S.2d 428; Rock Island Auction Sales v. Empire Packing Co., 32 Ill.2d 269, 273, 204 N.E.2d 721, 723 (1965); United States v. Loskocinski, 403 F.Supp. 75 (E.D.N.Y. 1975)).

. The majority implies that the payor bank in Met Frozen Food did not argue that the bankruptcy of the depositor precluded liability. Ante at 1497 & n.8. Again, the language of the New York court’s opinion reveals the majority’s error:
In a rather intriguing argument ... defendant contends that plaintiffs cannot establish [liability]. It argues that due to the short period of time between dishonor [of the checks] and [the depositor’s] bankruptcy, plaintiffs would have been unable, assuming a timely return, to retain the monies received since payment would represent a voidable preference____ However, here, since defendant was a payor bank its obligations were prescribed by [the Code], which, as previously noted, requires return to be made within a specified time____
The issue of whether payment by defendant of the checks in question would result in plaintiffs’ [sic] obtaining a preference over [the depositor’s] other creditors is not properly before this Court. It has not been established that the defendant is a creditor ... nor are these actions the appropriate forum [sic] for making such a determination. That issue may be relevant if and when a recovery is obtained.
393 N.Y.S.2d at 648 (emphasis added). The fact that the bankruptcy occurred after the bank attempted to dishonor the checks in no way alters the analysis. Nor does the majority’s assumption that the bank lacked knowledge of the impending bankruptcy. In fact, if the bank in Met Frozen Food was unaware of the impending bankruptcy of its depositor, it would have had an even stronger case on the "equities.” In any event, the New York court found the bankruptcy immaterial to the issues before it.

. I take issue with any implication in the majority opinion that its result is required by operation of federal bankruptcy law. Much is made of the point that if American is allowed to retain the money it will somehow receive favored treatment vis-a-vis other creditors of Manville. First, 1 believe this argument simply begs the question of who is Manville’s creditor. American has received no money from the bankruptcy estate. What has happened in this case, in essence, is that Morgan has purchased American’s claim against Manville. Thus, it is Morgan — not American — that is Manville’s creditor. Cf. note 3 supra.
Second, when we have referred to the bankruptcy policy that creditors share equally, we have meant that creditors in the same class or those possessing the same nonbankruptcy entitlements should share equally. But the initial step in this inquiry is to determine the nonbankruptcy entitlements of the creditors. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); Ohio v. Kovacs, 469 U.S. 274, 285, 105 S.Ct. 705, 711, 83 L.Ed.2d 649 (1985) (O’Connor, J., concurring); In re Anchorage International Inn, 718 F.2d 1446, passim (9th Cir.1983). I believe that American’s non-bankruptcy entitlements are greater than those of other unsecured creditors. Because American’s nonbankruptcy rights entitle it to full payment, American should be entitled to full payment in bankruptcy.
Finally, no creditor of the debtor is placed in a worse position in order to benefit any other creditor. Because there has been no distribution from estate assets, no unsecured creditor faces a diminished recovery. One creditor has simply been substituted for another. And the size of Morgan’s claim against the estate will be of a size equal to that American would have had absent Morgan's mistaken payment. Thus, I see no reason to alter the state law result in this case simply because the maker of the note happens to be in bankruptcy. Although Congress has the authority to upset state law substantive rights, "Congress has not done so." In re Anchorage International Inn, 718 F.2d at 1451.