*863 OPINION OF THE COURT
Shlomo S. Hagler, J.
Plaintiff Mohammad A. Khawaja commenced this action against J.E Morgan Chase Bank via an endorsed complaint alleging two causes of action for “failure to return deposit” and “failure to return money.” Chase interposed a written answer denying the allegations of the complaint and it commenced a third-party action against Muhammed Y. Ali and Amjad Ali (Alis or third-party defendants) seeking indemnification in the event that Chase is held liable to Khawaja. The third-party defendants interposed a written answer denying the allegations of the third-party complaint and alleging a cross claim against Khawaja also seeking indemnification in the event Chase prevails in its third-party complaint. At trial, the third-party defendants withdrew their answer.
Trial
This action was referred to this court for trial. The trial was conducted on June 16, 2005, and was adjourned to August 16, 2005, for plaintiff to obtain rebuttal witnesses. On August 16, 2005, plaintiff decided not to call any rebuttal witnesses. The trial concluded on that day with closing arguments and the court granted the parties leave to submit posttrial memoranda of law. Chase submitted its posttrial memorandum on October 31, 2005. The other parties opted not to submit posttrial memoranda.
Witnesses
Plaintiff testified on his own behalf. Chase called its employee, Francis Perez, a client associate teller and third-party defendant Amjad Ali as witnesses.
Findings of Fact
Khawaja and the Alis maintained separate bank accounts with Chase. Chase established an internal mechanism whereby its customers could transfer funds from one customer’s bank account to another via a written instrument denominated as a “transfer advice.” This mechanism made it unnecessary for its customers to utilize traditional negotiable instruments such as checks to transfer funds to each other.
On November 17, 2003, Khawaja’s wife presented Perez with two transfer advices at a Chase branch located at 322 West 125th Street, New York, New York. (Transcript of trial on June *864 16, 2005 [transcript] at 9, lines 22-24.) In the transfer advices, the Alis allegedly provided that $600 be transferred from the account of Amjad Ali to Khawaja’s joint account and that $18,700 be transferred from the account of Muhammed Y. Ali to Khawaja’s joint account. (Plaintiffs exhibit 2.) The transfer advices contained the notation in solid capital letters that: “THIS TRANSFER IS SUBJECT TO VERIFICATION AND OUR RULES AND REGULATIONS.”
Perez took the transfer advices from Khawaja’s wife and keyed in the funds transfer in Chase’s computer system. (Transcript at 49, line 6.) Perez then gave Khawaja’s wife a stamped copy of the transfer advices and two other copies remained of which “one stays in the teller’s scrap work and the other one at the end of the day goes down to the back office to processing.” (Transcript at 50, lines 7-10.)
Khawaja claimed that after his wife presented the transfer advices to Perez on the same day he called customer service and was told “that money was transferred into my account and the funds was [sic] available.” (Transcript at 10, lines 19-20.) Later that day, Perez stated that her assistant branch manager and the manager of operations, Sandra Graham and Shanine Benjamin, told her that the transactions relating to the transfer advices had to be reversed for two reasons. First, Amjad Ali had to personally appear at the time of presentation of the transfer advices under Chase’s rules. Second, Amjad Ali came into the branch and said that they did not authorize the presentation of the transfer advices. (Transcript at 51, line 25; at 52, lines 1-6.) Perez then immediately reversed or canceled the transactions and did not send the work to the back office for posting. (Transcript at 52, lines 11-15, 22-24.)
On the next day, November 18, 2003, Khawaja claimed that he tried to transfer money from his checking account to his money market account, but he allegedly learned on the telephone (apparently from customer service) that the money “disappeared.” (Transcript at 10, lines 24-25; at 11, lines 1-2.)
Notwithstanding Khawaja’s testimony to the contrary, Ali credibly testified that he did not authorize Khawaja to present the transfer advices to Chase for payment. (Transcript at 76, lines 8-11.) However, Ali acknowledged that the signatures on the transfer advices were his as an authorized signatory on his and his father’s account. (Transcript at 69, lines 1-15.) Again, contrary to Khawaja’s assertion, Ali testified that he did not mail the transfer advices to Khawaja in the week prior to the *865 presentation of the transfer advices. (Transcript at 76, lines 8-11.) Ali convincingly stated that he had previously given Khawaja numerous transfer advices signed in blank so that Khawaja could take care of certain office bills and accounts while the Alis, who traveled frequently, were away. (Transcript at 74, lines 3-25, 1-13.) Moreover, Ali testified that he did not keep track of the signed transfer advices and that it was possible that Khawaja could have had some remaining from the period prior to 2002. (Transcript at 75, lines 6-13.)
This court credits Perez’s and Ali’s testimony over Khawaja’s dubious testimony. Specifically, this court finds that Ali did not give Khawaja the authority to present the transfer advices for payment. In other words, the transfer advices were not presented in good faith and were, therefore, unauthorized.
Conclusions of Law
Issues
There are two issues that this court must determine herein as follows:
(1) Whether article 4 (Bank Deposits and Collections) or 4-A (Funds Transfers) of the New York Uniform Commercial Code is applicable to the facts of this case;
(2) Whether Chase or the Alis had the right or authority under article 4 or 4-A of the UCC to cancel, reverse or charge back the provisional credit that Chase initially gave Khawaja at presentation of the transfer advices.
Applicability of Articles 4 and 4-A of the UCC (Issue 1)
UCC Article 4
Article 4 of the UCC was adopted more than 40 years ago to deal with certain bank deposits and collections (L 1962, ch 553). Specifically, payment by check is covered by articles 3 and 4 of the UCC.
For article 4 to be applicable, one must examine whether the subject instrument falls within the definition of an “Item.” An “Item” is broadly defined as “any instrument for the payment of money even though it is not negotiable but does not include money.” (UCC 4-104 [1] [g].)
The following definitions are also crucial in determining the applicability of article 4. A “Depositary bank” means “the first bank to which an item is transferred for collection even though it is also the payor bank.” (UCC 4-105 [a].) A “Payor bank” is *866 defined as a “bank by which an item is payable as drawn or accepted.” (UCC 4-105 [b].) As in this instant case, article 4 envisions a scenario in which a bank can be both a depositary and payor bank. This scenario occurs when the payor and the payee of a check both have their accounts with the same bank. (See, e.g., Sunshine v Bankers Trust Co., 34 NY2d 404 [1974].) Article 4-A
Article 4-A was adopted about 15 years ago to deal with a rather new banking phenomenon, funds transfers (L 1990, ch 208). It governs a specialized method of payment referred to as a funds transfer, but which is also commonly referred to as a wholesale wire transfer. The Comment on this rather new article (reprinted in McKinney’s Cons Laws of NY, Book 62½, UCC 4-A-102, at 597) provided the underlying reason for its adoption as follows:
“The funds transfer governed by Article 4A is in large part a product of recent and developing technological changes. Before this Article was drafted there was no comprehensive body of law— statutory or judicial — that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not uniform. Judges have had to resolve disputes by referring to general principles of common law or equity, or they have sought guidance in statutes such as Article 4 which are applicable to other payment methods. But attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory . . .
“Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.”
With the above Comment in mind, there are distinct definitions, rights, duties and liabilities that apply to articles 4 and 4-A. Indeed, article 4-A utilizes a completely different lexicon of definitions such as “Payment order,” “Beneficiary,” “Beneficiary’s bank,” “Originator” and “Originator’s bank.”
A “Beneficiary” means “the person to be paid by the beneficiary’s bank.” (UCC 4-A-103 [1] [b].) A “Beneficiary’s bank” is defined, inter alia, as “the bank identified in a pay *867 ment order in which an account of the beneficiary is to be credited pursuant to the order” (UCC 4-A-103 [1] [c]). The “Originator” is “the sender of the first payment order in a funds transfer.” (UCC 4-A-104 [3].) The “Originator’s bank” means, inter alia, “the receiving bank to which the payment order of the originator is issued if the originator is not a bank” (UCC 4-A-104 [4]).
A “Payment order” is defined under UCC 4-A-103 (1) (a) as follows:
“(1) In this article:
“(a) ‘Payment order’ means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:
“(i) the instruction does not state a condition to payment to the beneficiary other than time of payment;
“(ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender; and
“(in) the instruction is transmitted by the sender directly to the receiving bank or to an agent, funds transfer system, or communication system for transmittal to the receiving bank.”
Analysis of Articles 4 and 4-A
At first blush, it appears that the transfer advices could fit into the definition of an “Item” described in article 4. This definition is so broad almost any banking instrument could fit into this general category. However, as compared to a “payment order,” it becomes clear that the transfer advices fit squarely into the concisely defined article 4-A. This determination becomes more apparent in light of Comment 1 to UCC 4-A-104 (reprinted in McKinney’s Cons Laws of NY, Book 62½, at 601) that cites case No. 1, which is very similar to the facts herein, as follows:
“X, which has an account in Bank A, instructs that bank to pay $1,000,000 to Y’s account in Bank A. Bank A carries out X’s instruction by making a credit of $1,000,000 to Y’s account and notifying Y that the credit is available for immediate withdrawal. The instruction by X to Bank A is a ‘payment order’ which was issued when it was sent to *868 Bank A. Section 4A-103 (a) (1) and (c) [enacted as section 4-A-103 (1) (a) and (3)]. X is the ‘sender’ of the payment order and Bank A is the ‘receiving bank.’ Section 4A-103 (a) (5) and (a) (4) [enacted as section 4-A-103 (1) (d) and (c)]. Y is the ‘beneficiary’ of the payment order and Bank A is the ‘beneficiary’s bank.’ Section 4A-103 (a) (2) and (a) (3) [enacted as section 4-A-103 (1) (b) and (c)] . . . The overall transaction, which comprises the acts of X and Bank A, in which the payment by X to Y is accomplished is referred to as the ‘funds transfer.’ ”
Therefore, this court concludes that the transfer advices must be analyzed under the criteria for payment orders under UCC 4-A-103.
Applicability of Article 4-A to This Case
In this case, the transfer advices qualify as payment orders which the Alis allegedly transmitted in writing to Chase to pay $19,300 to Khawaja. (UCC 4-A-103 [1] [a].) The transfer advices did not state a condition to payment to Khawaja. (UCC 4-A-103 [1] [a] [i].) Chase initially debited the Alis’ accounts and credited Khawaja’s account. (UCC 4-A-103 [1] [a] [ii].) The transfer advices were allegedly transmitted by the Alis to Chase through an agent, Khawaja’s wife. (UCC 4-A-103 [1] [a] [iii].) Thus, the transfer advices satisfy the criteria specified to be payment orders under UCC 4-A-103 (1) (a).
Cancellation of the Provisional Credit (Issue 2)
UCC 4-A-211 governs the cancellation of payment orders. Specifically, a sender may cancel a payment order virtually by any means before the payment order has been accepted by the receiving bank. (UCC 4-A-211 [1], [2].) However, after a payment order has been accepted, the sender may cancel the order only if the receiving bank consents or there was a prior agreement which effectively waived such consent. (UCC 4-A-211 [3].) If the payment order has been accepted by the beneficiary’s bank, the payment order may not be canceled, inter alia, “unless the order was issued in execution of an unauthorized payment order.” (UCC 4-A-211 [3] [b].) In such case, “the beneficiary bank is entitled to recover from the beneficiary any amount paid to the beneficiary to the extent allowed by the law governing mistake and restitution.” (Id.)
In this case, the Alis, as the senders, had the right to cancel the transfer advices with the consent of the receiving bank, *869 Chase. (UCC 4-A-211 [3].) Moreover, the cancellation would also be effective with respect to the receipt of the transfer advices by the beneficiary’s bank (Khawaja’s bank which is also Chase) because the transfer advices clearly constituted unauthorized payment orders pursuant to UCC 4-A-211 (3) (b). In any event, Chase would be entitled to recover from Khawaja any amount that it initially credited his account “to the extent allowed by the law governing mistake and restitution.” (Id.)
Conclusion
Based on the preponderance of the credible evidence, this court dismisses plaintiffs complaint with prejudice. The third-party complaint and cross claim must also be dismissed as being moot.