SCHERING–PLOUGH HEALTHCARE
PRODUCTS, INC., Plaintiff,

v.

NBD BANK, N.A., n/k/a NBD Bank,
and NBD Bank Dearborn, N.A.,
Defendants.

Civ. A. No. 95–70416.

United States District Court,
E.D. Michigan,
Southern Division.

June 12, 1995.

Steven Schubiner, Phillip J. Neuman, Jacob & Weingarten, Troy, MI, for plaintiff.

Duane M. Beeman, Traverse City, MI, Henry Shymanski, Rothstein Erlich, Southfield, MI, for defendant NBD.

## *MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

GADOLA, District Judge.

Plaintiff Schering–Plough Healthcare Products, Inc. ("Schering–Plough") is suing defendants NBD Bank, N.A. and NBD Bank Dearborn, N.A. (Collectively "NBD") for breach of contract. Before the court is NBD's motion to dismiss or, in the alternative, for summary judgment. For the reasons discussed below, the court will grant NBD's motion for summary judgment.

## I. Background

Plaintiff Schering–Plough is a supplier of healthcare products to F & M Distributors, Inc. ("F & M"). Schering–Plough is also an unsecured creditor of F & M. On November 30, 1994, F & M issued two checks to Schering–Plough and an affiliate company drawn off of F & M's account with NBD Dearborn. The checks were received by Schering–Plough on December 1, 1994 and were issued for the amounts of $111,903.20 and $335,-734.33. This lawsuit centers around Schering–Plough's attempts to receive payment on these two checks from NBD before the financially troubled F & M declared bankruptcy on December 5, 1994.

In its lawsuit, Schering–Plough alleges that NBD accepted the checks under MCLA § 440.3408 and thus has agreed to pay it the full amount promised on the face of the checks. In addition, Schering–Plough contends that NBD entered into three separate special agreements to pay the checks and that NBD breached its duty of good faith and fair dealing when it refused to honor the checks as promised in the agreements.

On December 1, 1994, a Schering–Plough employee from Memphis, Robert Harmon, received the two checks at issue from F & M in Detroit. He then went to the Warren, Michigan branch office of NBD where he requested that the checks be certified. An NBD teller told Harmon that the checks could not be certified, but that two NBD cashier's checks could be issued payable in amounts identical to the amounts of the two checks. Harmon was also told that there were sufficient funds in F & M's account to pay the checks. Harmon told the teller that he would like the cashier's checks and that he was willing to pay the required fee. The teller then told Harmon that the transaction would have to be handled a management representative.

Harmon then met with David Parlangeli, an assistant branch manager for NBD, and Harmon proceeded to tell Parlangeli of his request for cashier's checks. Parlangeli then took the checks to the back of the office where he checked to see if there was a stop payment order issued on the checks. When he discovered that there were no such or-

ders, he wrote on the checks "no stops" and "TV" which were the initials of the person from whom he had requested the information. When he returned, according to Harmon, Parlangeli told him that he could not issue the cashier's checks because he had spoken to an NBD senior loan officer handling F & M's account and that F & M was required to have a zero balance in its account at the end of each business day. According to Parlangeli, however, cashier's checks were not issued because Harmon decided not to go forward with the transaction because he did not want F & M to find out that Schering–Plough had requested cashier's checks. In any event, Harmon left NBD's branch office with the checks and then returned to Schering–Plough's headquarters in Memphis.

In Count II of its complaint, Schering–Plough identifies the words "no stops" and the initials "TV" on the checks as acting as NBD's signature and acceptance of the checks, thus requiring NBD to pay Schering–Plough the full amounts promised thereon. Additionally, in Count I, Schering–Plough claims that when NBD's teller told Harmon that cashier's checks could be issued instead of certification, NBD made a contractual promise to issue cashier's checks.

In Count III, Schering–Plough identifies a second agreement that it claims NBD entered into with it to pay the checks. On the morning of December 2, 1994, another Schering–Plough employee in Memphis, James Hamilton, contacted NBD's branch office in Dearborn, Michigan and spoke to Sandra Martin, an NBD assistant vice president, about the two checks. Martin told Hamilton that there were sufficient funds in F & M's account to pay the checks. Hamilton and Martin then discussed the different ways of obtaining payment. Martin told Hamilton that the best way to proceed would be for Hamilton to travel to Dearborn and present the checks for certification at NBD's branch office. She told Hamilton that if he came to the office before six o'clock that evening, that she would certify the checks. This statement by Martin amounts to the second, alleged contractual agreement by NBD to certify the checks for which Schering–Plough is seeking relief in Count III of its complaint.

After his conversation with Martin, Hamilton flew to Detroit and appeared at the Dearborn office at four o'clock in the afternoon. Martin met with Hamilton and then took the checks into a back office. Twenty minutes later, Martin returned and informed Hamilton that an NBD loan office in charge of F & M's loan account, Mark McClure, had said that the checks could not be certified. Hamilton then spoke to McClure who again stated that the checks would not be certified.

Count IV of Schering–Plough's complaint is based upon the third and final agreement that it alleges that NBD entered into to make funds available to it based upon the two checks. After Hamilton learned that the checks would not be certified, he told Martin that he wanted to open an account for Schering–Plough with NBD and then deposit the checks into the account. Martin informed Hamilton that she would know by noon on December 5, 1994 whether funds would be available for payment of the checks. Hamilton contends that Martin assured him that if he opened an account and if sufficient funds were in F & M's account on December 5, 1994, the funds would be credited to Schering–Plough's new NBD account. Schering–Plough contends that the opening of the new account and the promise to have funds credited to the account by noon on December 5, 1994, amounted to an agreement by NBD to pay the two checks.

On December 5, 1994, Hamilton contacted NBD and asked that the promised funds be wired to Schering–Plough's bank in Memphis. However, an NBD employee told Hamilton that the funds would not be available until December 7, 1994, because the checks were drawn on an affiliate bank, a bank that was separate from the bank where Schering–Plough's new account had just been opened. At five o'clock, on December 5, 1994, F & M filed a petition for relief under Chapter 11 of the Bankruptcy Code. On December 6, 1994, NBD issued a notice to Schering–Plough that the two checks were being returned to it unpaid and stamped with the notation "Refer to Maker."

On February 2, 1995, Schering–Plough filed the instant complaint, seeking $447,-637.53 from NBD based upon its failure to

pay Schering–Plough the amounts promised in the checks issued by F & M. As discussed earlier, the lawsuit is premised upon Schering–Plough's contention that NBD accepted the two checks for purposes of MCLA § 440.3408, and is thus obligated to pay the funds to Schering–Plough. In addition, Schering–Plough alleges that NBD entered into three separate side agreements to pay the checks or provide other services. Schering–Plough argues that NBD's failure to follow these agreements amounts to a breach of its duty of good faith and fair dealing.

On March 31, 1995, NBD filed the instant motion seeking dismissal or summary judgment.[1] NBD claims that it never accepted the checks and that there exists no special agreement between the parties that would make NBD liable apart from the instruments themselves. Furthermore, NBD claims that the alleged agreements are not supported by consideration, and that the agreements violate the statute of frauds.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962);

*Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a

---

1. Because its complaint was only filed on February 2, 1995, Schering–Plough argues that the court should not even consider NBD's motion because it has not had a chance to conduct any discovery for which to support its claims. However, Schering–Plough has presented several affidavits. In ruling on NBD's motion, the court will rely upon the facts presented in these affidavits.

fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings. *Id.*

### III. Analysis

### A. Acceptance of the Checks

■ In its motion, NBD alleges that it is not liable for the checks because it never accepted them. Under MCLA § 440.3408: "A check or other draft does not of itself operate as an assignment of funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until the drawee accepts it." *See Alden State Bank v. Old Kent Bank–Grand Traverse,* 180 Mich.App. 40, 446 N.W.2d 599 (1989), *appeal denied,* 434 Mich. 905 (1990). Pursuant to MCLA § 440.3409(1), acceptance "means the drawee's signed agreement to pay a draft as presented. It must be written on the draft and may consist of the drawee's signature alone." As to the definition of a "signature," according to MCLA § 440.3401,

(1) A person is not liable on an instrument unless (i) the person signed the instrument, or (ii) the person is represented by an agent or representative who signed the instrument and the signature is binding on the representative person under section 3402.

(2) A signature may be made (i) manually or by means of a device or machine, and (ii) by the use of any name, including a trade or assumed name, or by a word, mark, or symbol executed or adopted by a person with present intention to authenticate a writing.

*Id.* A determination of whether a mark constitutes a drawee's signature must be based upon common sense and commercial experience. *See Littky & Mallon v. Michigan Nat'l Bank of Detroit,* 94 Mich.App. 29, 32, 287 N.W.2d 359 (1979).

■ In this case, Schering–Plough contends that the writing "no stops" and "TV" on each of the checks *may* amount to acceptance of the checks by NBD for purposes of section 440.3408. The court finds, however, that the words "no stops" and "TV" written on the checks in these circumstances do not amount to NBD's signature signifying acceptance of liability on the checks. Based upon common sense and commercial experience, the court finds that there is no genuine issue of material fact as to the effect of the words "no stops" and "TV." Obviously, these words in no way represent NBD or any of its affiliate banks. Furthermore, the undisputed circumstances in which the words were written indicate that they were not to operate as an acceptance. These words were written on the checks by NBD employee David Parlangeli. It is undisputed that immediately after writing these words on the checks and conferring with a senior loan officer, Parlangeli then informed a Schering–Plough employee that NBD would not issue cashier's checks to him in exchange for the checks. The employee left the NBD office with the checks, and Schering–Plough then sought to find another way in which to procure payment or certification of the checks as NBD had refused to accept them. Based upon these circumstances and upon the nature of the writing itself, the court finds that NBD is not liable on the checks pursuant to section 440.3408.

### B. Agreement to Pay

■ Under the law of commercial paper, a drawee or payor bank of a check is not liable on the check unless it has certified or accepted the check. However, a drawee may be liable apart from the instrument based upon a contract or tort theory of recovery. *See Alden State Bank,* 180 Mich.App. at 42–43, 446 N.W.2d 599; MCLA § 3408, 1993 amdt. cmt.

■ In this case, Schering–Plough alleges that NBD entered into three separate contracts whereby it became liable to pay the checks. The three alleged agreements are as follows: (1) on December 1, 1994, an NBD teller agreed to issue cashier's checks in exchange for payment of the regular fee for

the issuance of cashier's checks; (2) on December 2, 1994, an NBD assistant vice president agreed to certify the two checks if a Schering–Plough representative traveled to Detroit from Memphis; and (3) on December 2, 1994, an NBD assistant vice president agreed to release the funds promised in the two checks to Schering–Plough by noon on December 5, 1994, if Schering–Plough opened a bank account with NBD. Schering–Plough claims that NBD has breached each these three contracts and is seeking recovery of $447,637.53 as damages.

In its motion, NBD contends that it is not contractually liable to pay the checks because there were no agreements between the parties as claimed by Schering–Plough. In addition, NBD claims that all three agreements are invalid under the statute of frauds. Finally, NBD alleges that the agreements are not supported by consideration. For these reasons, NBD is seeking summary judgment or dismissal.

## 1. Agreement

NBD contends that contracts to certify checks, to issue cashier's checks, and to make funds available between itself and Schering–Plough, as expressed in Counts I, III, and IV, never existed because there were no special agreements between the parties to enter into such relationships. NBD argues that Schering–Plough is merely trying to use various preliminary discussions with NBD employees in order to create contracts that did not exist. NBD claims that in each instance its final decision was to reject Schering–Plough's requests for certification, for cashier's checks, and to make funds available. As a result, NBD contends that it cannot be held liable on the contracts because there was no meeting of the minds that is required for a valid contract. In addition, NBD alleges that each of the alleged special agreements were not supported by consideration.

The court finds that no agreement existed between NBD and Schering–Plough to certify the checks in question, to issue cashier's checks, or to make funds available based upon the checks. Under the facts alleged in the affidavits submitted by Schering–Plough's employees, the alleged agreements merely amounted to preliminary discussions, invitations to deal, and estimates of the availability of funds rather than the firm and objective commitment that is required for contractual liability.

According to Schering–Plough's employees, when certification was first sought, an NBD teller merely made it clear that certification was not possible at that particular branch office, but that cashier's checks could be issued. Before any cashier's checks were issued, however, the teller was forced to turn the transaction over to more senior personnel, presumably because of the very nature and amounts of the checks. In the circumstances of this case, involving the issuance of cashier's checks for nearly $500,000, a final binding commitment cannot be premised upon a teller's mere statement that such a service was available once the requisite fee was paid. Construction of contractual liability around such circumstances would turn triviality into a bargained-for commitment. In this instance, the court finds that instead of an agreement to issue cashier's checks, there was a rejection of Schering–Plough's request by NBD management personnel. As a result, NBD is not contractually obligated to issue cashier's checks.

In the same way, the alleged agreement to certify the checks was not an agreement at all. Instead, NBD personnel merely informed a Schering–Plough employee that certification of checks could occur at a certain branch office as long as checks were presented and they were accepted. In this case, once a Schering–Plough employee appeared at the named branch office with checks in hand, the real decision of whether to certify the checks was made. The invitation to deal by traveling from Memphis to Dearborn does not amount to an agreement to certify. It amounted to an agreement to consider certification once the checks were presented. The request for certification was ultimately denied. The law is clear that NBD, as the drawee or payor bank, was under no obligation to certify the checks. MCLA § 440.3408. An indication that certification was available does not amount to the kind of contractual agreement that would

bind NBD apart from the checks themselves. As a result, NBD deserves summary judgment as to this claim as well.

A similar conclusion is reached upon examining the circumstances surrounding the alleged agreement to make funds available. Once NBD refused Schering–Plough's requests for certification and for cashier's checks, Schering–Plough sought the fastest possible way to get the funds represented by F & M's checks. Rather than simply depositing them in its bank in Memphis, Schering–Plough opened an account with NBD, apparently with the hope that the checks would clear sooner. Schering–Plough contends that it took this action based upon NBD's promise to make the funds available by noon on December 5, 1994. However, rather than a meeting of the minds resulting in a binding contract, the circumstances indicate a mere estimate of the availability of the funds, premised upon NBD's continued and acknowledged ability as drawee to dishonor the checks. As a result, again the agreement alleged by Schering–Plough amounts to preliminary discussions that do not amount to an objective expression of contractual commitment.

## 2. Consideration

■ The court also finds that the alleged promises to certify the checks and to make funds available were not supported by consideration.[2] The essence of consideration is a legal detriment that has been bargained for and exchanged for the promise sought. *Higgins v. Monroe Evening News,* 404 Mich. 1, 272 N.W.2d 537 (1978).

■ In this case, Schering–Plough alleges that the consideration given in exchange for the promise to certify the checks was the trip from Memphis to Dearborn. Schering–Plough contends that NBD employee Sandra Martin stated that if the checks were brought to Dearborn from Memphis, then the checks would be certified. The point that Schering–Plough appears to miss, however, is that a reasonable person would surely recognize that the trip from Memphis was not *bargained for in exchange for* the promise to certify; rather, the trip was merely a necessary prerequisite for NBD to even consider certification. Under these circumstances, there was no consideration to support the alleged agreement to certify the two checks at issue.

Similarly, the "agreement" to make funds available is alleged to have been premised upon the opening of an account with NBD by Schering–Plough. However, the nature of the account relationship was that it was dependent upon the clearance of the checks, an ability that NBD did not relinquish through any special agreement cited in this case. Schering–Plough has failed to identify any additional consideration that could serve as the basis of such a special agreement. As a result, summary judgment is proper on this basis as well.

## 3. Statute of Frauds

■ NBD claims that all three alleged agreements are barred by Michigan's statute of frauds. Under MCLA 566.132(2),

(2) An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:

(a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.

*Id.* There is no dispute that NBD qualifies as a financial institution as defined by the statute. *Id.* § 566.132(3). The parties are in dispute, however, as to whether any of the three alleged agreements to issue cashier's checks, certify checks, or to make funds available presented in Counts I, III, and IV qualifies as a promise to "make any other financial accommodation." This particular section of the statute is relatively new and

---

**2.** It is unclear at this point whether the same conclusion can be reached as to the promise to issue cashier's checks. It appears, however, that the "fee" for cashier's checks promised by Schering–Plough was the transaction fee for the service of issuing a cashier's check. It was not a fee bargained for in exchange for the alleged promise to issue cashier's check. In any event, the court's decision as to this particular agreement is premised elsewhere.

only became effective on January 1, 1993. As such, this is a case of first impression in the Michigan and federal courts.

Schering–Plough argues that section 566.132(2) is inapplicable because the agreements alleged here do not amount to an extension of credit or any similar financial accommodation. However, NBD contends that the term "financial accommodation" is sufficiently broad to encompass the circumstances of the agreements presented.

The court finds that section 566.132(2) applies to the three agreements alleged in this case. As a result, since none of the three agreements are expressed in a writing signed by NBD, Schering–Plough cannot premise its causes of action upon their existence. The court is convinced of the necessity of its interpretation of section 566.132(2) by the very facts presented by this case.

In this instance, liability for almost $500,000 is being premised upon preliminary oral discussions in person and over the telephone where the ultimate decision in each case was a clear and unequivocal rejection of the requested service. The very nature of the certification of checks, acceptance of checks, and the issuance of cashier's checks is that they are executory actions. A bank either certifies a check or it does not. A bank issues a cashier's check or refuses to issue one. Similarly, the availability of funds depends upon their release.[3] Promises to do each of these activities amount to special circumstances that are out of the ordinary. As such, they fall within the broad range of conduct contemplated by the phrase "financial accommodation." Schering–Plough attempts to cite to legislative history that it argues would restrict the reach of section 566.132(2). *See* House Legislative Analysis Section, (*Financial Institution Commitments* 1 December 7, 1992). However, Schering–Plough's interpretation is belied by the broad nature of the language of the statute and the fact that a separate definitional subsection was not included for the term "financial accommodation" even though such a definitional clause was included for "financial institution." In addition, the legislative history cited by Schering–Plough indicates that the bill was intended to provide needed protection to banks, especially in lawsuits against banks "brought by a business that has experienced a large downturn and is making a last ditch effort to generate income." *Id.* In this instance, it appears that Schering–Plough has suffered a large loss as a result of F & M's bankruptcy and is attempting to spread the loss to NBD, just the situation seemingly contemplated before the statute was enacted.

In conclusion, the court finds that all three of the alleged agreements are barred by section 566.132(2) of Michigan's statute of frauds. The services contemplated in the three agreements each amounts to a financial accommodation given the executory nature of the services contemplated. The special promises expressed in the agreements amounted to an added risk to NBD that would not have occurred in the normal course of business absent a special and specific written agreement that recognized the special risk assumed by NBD in exchange for a rational consideration for that risk.[4]

## C. Good Faith and Fair Dealing

▮ In Count V of its complaint, Schering–Plough alleges that NBD breached its duty of good faith and fair dealing pursuant to MCLA § 440.1203 in failing to follow the three agreements concerning the checks. In

---

3. The oral promise to release funds on a date certain alleged by Schering–Plough is also problematic because a written agreement was executed with the opening of the account. This agreement gives NBD the power to clear monies from a deposited check at its discretion. As a result, any promise to make funds available by NBD is limited by the written agreement entered into by the parties governing their account relationship.

4. Given that Schering–Plough contends that all of the parties were aware that the maker of the checks, F & M, was teetering on the brink of bankruptcy at the time that the three special agreements are alleged to have been made, the necessity of a written and signed document to memorialize such financial accommodations is readily apparent. Although Schering–Plough argues that the term "financial accommodation" only applies to extensions of credit, it seems that even this restricted definition would apply here where it was apparent to all of the parties that the maker of the checks was insolvent and would not be able to fulfill the promises made in the form of the two checks.

its motion, NBD contends that Schering–Plough has failed to state a valid cause of action, assuming that the court finds that there were no valid agreements between the parties.

■ The court finds that based upon the court's rulings in this memorandum opinion, Schering–Plough has failed to state a cause of action upon which relief can be granted in Count V. The parties agree that under *State Bank of Standish v. Curry*, 190 Mich.App. 616, 476 N.W.2d 635 (1991), *aff'd in relevant part and rev'd in part*, 442 Mich. 76, 500 N.W.2d 104 (1993), the duty of good faith and fair dealing is not breached except where an underlying agreement exists. In this case, the court has already found that there were no agreements between the parties concerning payment on the two checks. As a result, NBD cannot be liable for breach of the duty expressed in section 440.1203.

### ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED that defendants' motion for summary judgment is GRANTED.

SO ORDERED.