**SCHERING–PLOUGH HEALTHCARE PRODUCTS, INC., Plaintiff–Appellant,**

v.

**NBD BANK, N.A., n/k/a NBD Bank, and NBD Bank Dearborn, N.A., Defendants–Appellees.**

No. 95–1781.

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1996.

Decided Oct. 25, 1996.

Brian D. Figot, Troy, MI (argued and briefed), for Plaintiff–Appellant.

Henry J. Shymanski, NBD Bank, Detroit, MI (argued and briefed), for Defendants–Appellees.

Before: KENNEDY and NORRIS; Circuit Judges; MATIA *, District Judge.

KENNEDY, J., delivered the opinion of the court, in which NORRIS, J., joined. MATIA, J. (pp. 913–19), delivered a separate dissenting opinion.

KENNEDY, Circuit Judge.

Plaintiff Schering–Plough Healthcare Products, Inc., ("Schering–Plough") appeals from an order of summary judgment for defendants, NBD Bank ("NBD") and NBD Bank Dearborn ("NBD–Dearborn"), in this breach of contract action. Plaintiff argues that the District Court erred when it: (1) interpreted Michigan's Statute of Frauds to bar its enforcement of defendants' alleged promises to certify certain checks, issue cashier's checks, and deposit certain funds into its account; (2) found that defendants did not accept certain checks for payment; (3) concluded that defendants had not contracted to certify certain checks, issue cashier's checks, and make certain funds available; and, (4) determined that defendants had not breached their duties of good faith performance and fair dealing. For the following reasons, we AFFIRM.

## I. Facts

On December 1, 1994, Schering–Plough, a supplier of healthcare products, received two checks from F & M Distributors, Inc. ("F & M"). The first check, which was payable to Schering–Plough, was in the amount of $111,903.20. The second check was in the amount of $335,734.33 and was payable to an affiliate of Schering–Plough. Both checks were drawn on F & M's controlled disbursement account at NBD–Dearborn, an affiliate of NBD that handles only these types of accounts. This account was a "zero balance" arrangement under which NBD–Dearborn notified F & M, through a computer system report, of the checks presented for payment. Each day the account would begin with a zero balance and, upon F & M's direction, would be funded by a funding account, which in turn was funded by deposits by F & M and borrowings from F & M's credit facilities, to pay those checks presented for payment. Because F & M had the discretion to fund the account to pay checks after they were presented for payment, NBD–Dearborn would not know if there were adequate funds in F & M's account until the end of the day on which the checks were posted on the computer system report.

On Thursday, December 1, 1994, Robert Harmon, an employee of Schering–Plough, took the F & M checks to the Warren, Michigan, branch of NBD (NBD–Warren). At NBD–Warren, Harmon was told that F & M's account had sufficient funds to pay the checks and that the checks could be converted to cashier's checks. David Parlangeli, an assistant manager at NBD–Warren, verified that no stop payment orders had been placed on the checks, and then wrote "no stops" and "TV," the initials of the person from whom he received that information, on the checks. According to plaintiff, Parlangeli spoke with a senior loan officer for F & M's account and then informed Harmon that he would not issue cashier's checks for the F & M checks. Harmon left the bank with the checks, and without cashier's checks.

The following day, Friday, December 2, Schering–Plough employee James Hamilton telephoned the Fairlane branch of NBD (NBD–Fairlane) and spoke with Assistant Vice President Sandra Martin. Plaintiff claims that Martin confirmed that funds were

* The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation.

available to pay the checks and that the checks could be properly presented at her bank branch for certification. That afternoon, Hamilton arrived at NBD–Fairlane and presented Martin with the checks for certification. After consulting the folder containing information necessary to certify checks on zero balance controlled disbursement accounts, Martin learned and informed Hamilton that the F & M checks could not be certified.[1]

Because NBD would not certify the checks or issue cashier's checks in lieu of their certification, Hamilton decided to open an account with NBD–Fairlane and deposit the checks in an effort to expedite the availability of those funds. He contacted his office and instructed employees there to assemble and fax the documents needed to do that. The account, which was governed by a contract affording NBD the right to wait a reasonable time after an item has been deposited into the account before funds may be withdrawn to insure that the item has been collected, was opened on a temporary basis until the documents authorizing the account were legally reviewed.

Martin told Hamilton that she would know by mid-day on Monday, December 5, whether funds would be available for payment of the checks. Because she would not be in the office on Monday, Martin instructed Hamilton to call another employee, Cheryl Mosby, to verify that the funds had been deposited.

As instructed, Hamilton called Mosby on Monday and inquired whether the funds had been deposited in Schering–Plough's newly opened account. According to Hamilton, Mosby told him that because F & M's account was an "interdepartment" bank branch account and Schering–Plough's account was a regular NBD checking account, she would not know if the funds were collected until Wednesday, December 7.

NBD–Dearborn received the checks on Monday, December 5. That same day, F & M filed a petition for relief under Chapter 11 of the Bankruptcy Code.[2] The following day, NBD issued a notice to Schering–Plough stating that the checks were being returned unpaid with the notation "refer to maker."

Schering–Plough filed this suit against NBD and NBD–Dearborn alleging that NBD and NBD–Dearborn accepted the checks under MICH. COMP. LAWS § 440.3408 and thus agreed to pay the amount indicated on the face of the checks. In addition, Schering–Plough claimed that: (1) NBD breached its alleged agreement of December 1, 1994, to issue cashier's checks in exchange for the F & M checks; (2) NBD and NBD–Dearborn breached their alleged agreement of December 2, 1994, to certify the checks upon presentment; and (3) NBD and NBD–Dearborn breached their alleged agreement to make the funds represented by the checks available to Schering–Plough in its newly-opened account by mid-day December 5. Finally, Schering–Plough claimed that defendants breached their duties of good faith and fair dealing when they refused to honor the checks as promised in those agreements.

The District Court granted defendants' motion for summary judgment, holding that the "no stops" and "TV" markings did not constitute acceptance of the checks, that NBD's alleged promises to certify the checks, to issue cashier's checks, or to make funds available were merely "preliminary discussions, invitations to deal, and estimates of the availability of funds rather than the firm and objective commitment that is required for contractual liability," 890 F.Supp. 651, 656 (E.D.Mich.1995), and that there was neither consideration for those agreements nor a consideration substitute such as promissory estoppel. The District Court further held

---

1. On November 29, 1994, F & M issued a press release stating that it would report a loss for its quarter ending October 29, 1994. This reported loss resulted in F & M's default under its revolving credit agreement agented by NBD and thereby eliminated F & M's ability to borrow under its working capital facility. Because NBD was uncertain as to whether the funding account would be able to fund F & M's zero balance controlled disbursement account, it decided that it would no longer certify checks issued by F & M or issue cashier's checks in lieu of certifying them.

2. At that time, F & M owed NBD $100,900,000, which included amounts available for draw under outstanding letters of credit, costs and expenses, interest, and attorneys' and consultants' fees.

that because all three alleged agreements were oral promises to engage in financial accommodations, the Michigan Statute of Frauds, MICH. COMP. LAWS § 566.132(2), bars their enforcement. Finally, the District Court dismissed plaintiff's cause of action for breach of duties of good faith and fair dealing on the basis that that cause of action cannot be sustained in the absence of an underlying, enforceable agreement. Plaintiff appeals from the District Court's grant of summary judgment.

## II. Discussion

### A. Standard of Review

■ We review a grant of summary judgment de novo. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether summary judgment is proper, we view the facts and any reasonable inferences drawn from those facts in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The mere existence of a colorable actual dispute does not preclude an award of summary judgment; there must be a genuine dispute between the parties on an issue of material fact in order to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

### B. Acceptance of Checks

■ Schering–Plough argues that the District Court erred when it granted summary judgment for the defendants, claiming that there is a genuine issue of material fact regarding whether the "no stops" and "TV" notations on the checks evidence NBD's intent to accept the checks. NBD's operating procedures provide that before a cashier's check is issued for a check drawn against an NBD–Dearborn zero balance controlled disbursement account, the issuing employee must verify with the bookkeeper that no stop payments exist on the check and place the initials of the bookkeeper who provides that information on the check.[3] Plaintiff suggests that once Parlangeli wrote "no stops" and "TV" on the checks, as required by the operating procedures, the checks were accepted, and that the "TV" and "no stops" markings evidence their acceptance. We disagree.

Under Michigan law,

"[a]cceptance" means the drawee's signed agreement to pay a draft as presented. It must be written on the draft and may consist of the drawee's signature alone. Acceptance may be made at any time and becomes effective when notification pursuant to instructions is given or the accepted draft is delivered for the purpose of giving rights on the acceptance to any person.

MICH. COMP. LAWS § 440.3409(1). A signature may be made "(i) manually or by means of a device or machine, and (ii) by the use of any name, including a trade or assumed name, or by a word, mark, or a symbol executed or adopted by a person with present intention to authenticate a writing." MICH. COMP. LAWS § 440.3401(2).

Neither "no stops" nor "TV" constitutes NBD's signed agreement to pay the checks as presented. "No stops" simply indicates that the drawer had not canceled the checks, and "TV" merely identifies the individual who provided that information. These markings do not represent a name, word, mark or symbol adopted by NBD. Nor do they evidence NBD's intent to pay the drafts as

**3.** Operating Procedure 3.00 in relevant part provides:

*CERTIFICATION OF NBD DEARBORN CONTROLLED DISBURSEMENT CHECKS*

In the event a branch is requested to certify a check drawn against an NBD Dearborn Controlled Disbursement Account, the customer is to be encouraged to accept an NBD Cashiers Check in lieu of certification. . . .

Prior to issuing a Cashier's Check, contact ARP Bookkeeping, Stop Payment Section (225–2185) to verify that no Stop Payment exists on the item presented. Record the bookkeeper's initials on the back of the check. Inform the bookkeeper that the check is *not* being certified but a Cashier's Check is being issued in lieu of certification.

presented or to authenticate them. Instead, they indicate that the checks satisfied one preliminary requirement to certification. Therefore, we conclude there is no genuine issue of material fact as to whether NBD accepted the checks.

### C. The Michigan Statute of Frauds

■ Schering–Plough also challenges the District Court's findings that the alleged promises to issue cashier's checks, to certify the checks, and to make funds available constituted merely preliminary discussions, invitations to deal, and estimates of the availability of funds rather than the commitment required for contractual liability, and that the alleged promises were unsupported by consideration or a consideration substitute. Because we conclude, as did the District Court, that the Michigan Statute of Frauds bars the enforcement of these alleged agreements, it is unnecessary for us to consider whether these agreements were supported by consideration or reflected the intent of the parties to be contractually bound.

The Michigan Statute of Frauds in relevant part provides:

An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:

(a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.

MICH. COMP. LAWS § 566.132(2). The statute fails to define "financial accommodation," and we and the Michigan courts have not had occasion to consider whether issuing a cashier's check in exchange for a check drawn on a zero balance controlled disbursement account, certifying a check drawn on a zero balance controlled disbursement account, or making available funds represented by a check drawn on a zero balance controlled disbursement account are financial accommodations. However, plaintiff urges us to adopt a definition of financial accommodation that includes only extensions of money or credit to accommodate another. We reject plaintiff's argument.

■ Because the Michigan Statute of Frauds explicitly bars the enforcement of oral promises to extend money or credit, interpreting financial accommodation to reference only transactions involving the extension of money or credit would render the financial accommodation language superfluous. It is a well-settled rule of statutory construction, however, that courts should avoid interpretations of statute that render words superfluous. *Vause v. Capital Poly Bag, Inc. (In re Vause)*, 886 F.2d 794, 801 (6th Cir.1989). Instead, after an examination of the purpose of the statute and the nature of the promises alleged in this case, we conclude that the term financial accommodation refers to transactions other than those involving the extension of money or credit.

The legislative history of Michigan's Statute of Frauds reflects that the statute was designed to protect financial institutions from suits, by businesses that have experienced a significant downturn, alleging oral promises of financial commitment that expose the financial institution to a risk of loss. House Legislative Analysis Section, Financial Institution Commitments, House Bill 5968 (12–7–92). To determine whether the alleged agreements in this case were such promises of financial commitment, we examine whether execution of these promises would have required NBD to advance its own funds at a risk of loss.

■ Before considering whether the alleged promises were promises of financial accommodation within the meaning of the Michigan Statute of Frauds, however, it is necessary to understand the nature of a cashier's check and a certified check. First, a cashier's check is a bill of exchange drawn by a bank on itself. *Mutual Sav. & Loan v. National Bank of Detroit*, 185 Mich.App. 591, 462 N.W.2d 797, 799 (1990). Upon its issuance, a cashier's check is a primary obligation of the issuing bank. *Id.* It represents the bank's noncountermandable promise to make available its own resources to pay the amount represented by the check upon demand. *Id.*

Just as a bank pledges its own resources when it issues a cashier's check, when a bank certifies a check, it accepts that check thereby assuming liability for its payment. MICH. COMP. LAWS § 440.3409(4). A certified check is a check accepted by the bank on which it is drawn. Certifying a check

> implies that the check is drawn upon sufficient funds in the hands of the drawee, that they have been set apart for its satisfaction, and that they shall be so applied whenever the check is presented for payment. It is an undertaking that the check is good then, and shall continue good, and this agreement is as binding on the bank as its notes of circulation, a certificate of deposit payable to the order of depositor, or any other obligation it can assume.

*First Nat'l Bank v. Currie,* 147 Mich. 72, 110 N.W. 499, 501 (1907) (quoting *Merchants' Bank v. State Bank,* 77 U.S. (10 Wall.) 604, 647–48, 19 L.Ed. 1008 (1870)). Once the bank certifies a check it is estopped from denying liability on the check. *See First Nat'l Bank,* 110 N.W. at 502–03.

When a bank issues a cashier's check in exchange for a check drawn on a zero balance controlled disbursement account, certifies a check drawn on a zero balance controlled disbursement account, or makes available funds represented by a check drawn on a zero balance controlled disbursement account, before the account has been funded for the check's payment, the financial institution assumes a risk of loss. That risk of loss stems from the fact that the payor of a check drawn on a zero balance controlled disbursement account may choose not to or be unable to fund the account for the check's payment even after the check has been submitted to the drawee bank for collection; there is no guarantee that the check will be paid.[4] Even if the bank has the authority to automatically transfer funds from the funding account or to draw on a credit line to fund the zero balance controlled disbursement account, the funding account may be depleted or no funds may remain on the line of credit such that there are no available sources of funding. In the event that the account, for whatever reason, is not funded for payment of that check, the bank that issued the cashier's check in exchange for a check drawn on a zero balance controlled disbursement account or certified that check must nonetheless honor the cashier's check or the certified check. *See United States v. Wolfswinkel,* 44 F.3d 782, 786 (9th Cir.1995) (acknowledging that when a bank issues a cashier's check in exchange for a check it bears a risk of loss); *Gordon Fireworks Co. v. Capital Nat'l Bank,* 236 Mich. 271, 210 N.W. 263, 263 (1926) (recognizing that a bank is liable on a check it has certified). Similarly, if the financial institution makes the funds represented by the check available to the payee before the controlled disbursement account has been funded for the check's payment, and the zero balance controlled disbursement account is not funded, the financial institution may bear the risk of loss; once those funds are no longer in its possession, the bank cannot easily recover them.[5]

**4.** The dissent suggests that we have assumed that F & M had "enhanced rights to determine whether or not it would pay checks presented on its account." Dissenting opinion at p. 916. This characterization of our opinion, however, is inaccurate. We have assumed that F & M could fail to fund its account for the payment of checks. This failure to fund is no different from the possibility that an individual will withdraw all of his funds from his checking account before all of the checks have been presented for payment. In either case, funds would be unavailable for the payment of the checks that are outstanding. Although the payee of the check would not have recourse against the bank for its failure to pay the check when no funds were available, he would have recourse against the payor of the check for monies rightfully due. Therefore, our opinion assumes only that F & M had the ability to do what any other holder of a checking account has the ability to do, that is, fail to maintain sufficient funds in his account for the payment of the checks he issues.

**5.** The dissent suggests that, as described in defendants' brief, F & M had the right to place stop payment orders on checks drawn on its zero balance controlled disbursement account. It then proceeds to discuss the provisions of the Uniform Commercial Code ("UCC") that protect the bank when it pays a check over a stop payment order. F & M's ability to place stop payment orders on checks that it issues, however, is not a basis for our determination that paying these checks as allegedly promised would have required defendants to advance their own funds

The dissent accuses the majority of the Court of exaggerating the risk that defendants would have assumed had they executed the agreements as alleged. The dissent suggests that if F & M had failed to fund the account for the checks' payment after defendants paid those checks, the bank would have had "simple and straightforward recourse against [F & M]." As this case, demonstrates, however, that is not always the case. F & M's bankruptcy would have frustrated any efforts on the part of the defendants to obtain "simple and straightforward" recourse.[6] Due to the bankruptcy filing, defendants would have been forced by operation of the automatic stay to seek recovery in the context of the bankruptcy proceedings. Unless they were secured or could claim a right of set-off, their recovery would most likely be limited. Since defendants would have assumed the risk that quick and complete repayment in the event that the account was not funded would not be available if it engaged in the transactions as alleged, the promises were promises of financial accommodation.

 As is evident by the facts of this case, issuing a cashier's check in exchange for a check drawn on a zero balance controlled disbursement account, certifying a check drawn on a zero balance controlled disbursement account, and making available funds represented by a check drawn on a zero balance controlled disbursement account before the account has been funded for the check's payment, expose the financial institution to a risk of loss and, therefore, are financial accommodations within the meaning of the Michigan Statute of Frauds.[7] Accordingly, promises to engage in these transactions are unenforceable unless in writing.

Because NBD's alleged December 1 promise to issue plaintiff cashier's checks in exchange for checks drawn on F & M's zero

at a risk of loss. However, we do note that issuing a stop payment order and failing to fund the zero balance controlled disbursement account are distinct mechanisms of preventing payment on a check. While a stop payment order directs the bank not to pay a check for six months, MICH. COMP. LAWS § 440.4403(2), the failure to fund the account for the payment of a check prevents the payment of a check only until the account is funded, an event that may occur at any time.

6. We also question whether, as the dissent suggests, customers have a contractual duty to their bank to fund their accounts for payments of checks.

7. The dissent suggests that our conclusion that the promises to engage in these transactions were promises of financial accommodations has the effect of amending the UCC in violation of the Michigan Court of Appeals' directive in *Brown v. Yousif*, 198 Mich.App. 667, 499 N.W.2d 446, 449 (1993), *vacated in part on other grounds*, 445 Mich. 222, 517 N.W.2d 727 (1994). In *Brown*, the plaintiff brought an action seeking foreclosure of his security interest in a liquor license pursuant to a promissory note and reassignment agreement executed in connection with the sale of a business. *Brown*, 499 N.W.2d at 447. The trial court granted defendant's motion for summary judgment on the grounds that the Liquor Control Commission ("LCC"), an administrative body, had adopted a rule removing liquor licenses from the reach of Article 9 of the UCC and prohibiting the creation of security interests in liquor licenses. *Id.* 499 N.W.2d at 448–49. The Michigan Court of Appeals re-

versed the grant of summary judgment, holding that although the LCC had been given authority to control the traffic of alcoholic beverages, it had not been given the authority to amend the UCC. *Id* 499 N.W.2d at 449. The court relied on MICH. COMP. LAWS § 440.1104, which states:

> This act being of a general act intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can be reasonably avoided.

Although the Michigan Court of Appeals interpreted this section, as the dissent indicates, to prohibit "any implied amendments of the Uniform Commercial Code," we interpret this statement in light of the quoted provision and conclude that it only prohibits the implied *repeal* of portions of the UCC. *See Brown v. Yousif*, 445 Mich. 222, 517 N.W.2d 727, 731 (1994) (interpreting MICH. COMP. LAWS § 440.1104 to prohibit the "implied repeal by statute" of the UCC).

While Articles 3 and 4 of the UCC regulate commercial paper and the conduct of banks and their customers, they do not govern *oral promises* to engage in those transactions. In addition, the UCC's statute of frauds does not address the enforceability of oral promises made by financial institutions such as the ones at issue in this case. MICH. COMP. LAWS § 440.2201. Instead, it only governs oral promises involving sales of goods. Because § 566.132 does not repeal and is not inconsistent with any UCC section, we conclude that interpreting that statute to reach the alleged promises to engage in the banking transactions at issue in this case does not violate the directive of MICH. COMP. LAWS § 440.1104.

balance controlled disbursement account and defendants' alleged agreement to certify those checks are promises to engage in financial accommodations and are not evidenced by a writing, they are not enforceable. Finally, because defendants' alleged agreement to make the funds represented by the checks available in plaintiff's newly-opened account by mid-day December 5 also falls within the meaning of financial accommodation, we conclude that it too is unenforceable absent a writing.

Nonetheless, plaintiff argues that NBD's alleged promises to make available the funds represented by the F & M checks by issuing cashier's checks, certifying the checks, or by depositing those funds in plaintiff's account, were not promises of financial accommodation, but merely promises to perform a bookkeeping task involving debiting F & M's account and crediting plaintiff the amount of that debit. Plaintiff's argument, however, ignores the nature of the zero balance controlled disbursement account. When the account has a balance greater than zero, those funds that are in the account have been designated to pay the checks that have already been presented, not the checks that may be presented in the future. Only after the check has been presented for payment is the payor requested to fund the account for that check's payment. However, as discussed earlier, the account may not be funded for any of a number of reasons. Because there were no such funds in F & M's zero balance controlled disbursement account that were available to debit when the checks were presented for payment, the alleged promises were not merely promises to perform accounting functions. Instead, they were defendants' promises to make its own funds available for the checks' payment and, there-

fore, were promises of financial accommodation.

▪ Finally, plaintiff argues that, by definition, the term "financial accommodation" does not include agreements supported by consideration. Plaintiff, therefore, suggests that because the alleged agreements in this case were supported by consideration, they were not financial accommodations and, thus, the Michigan Statute of Frauds does not bar their enforcement. The Michigan Statute of Frauds bars the enforcement of oral promises "to lend money, grant or extend credit, or make any other financial accommodation." MICH. COMP. LAWS § 566.132(2)(a). The statute characterizes promises to lend money and grant or extend credit as types of financial accommodations. *See* MICH. COMP. LAWS § 566.132(2)(a). Plaintiff's argument, therefore, suggests that whenever an oral promise to lend money or grant or extend credit is supported by consideration it does not fall within the Michigan Statute of Frauds. This interpretation, however, would defeat the purpose of the statute. Instead, the Statute of Frauds is unconcerned with whether certain promises are supported by consideration. It presupposes that the agreements are otherwise enforceable, and prevents their enforcement based on the type of promise and the fact that they are not evidenced by a writing. Therefore, we find that plaintiff's argument that the Michigan Statute of Frauds does not apply to defendants' alleged promises is without merit.

Given the applicability of the Statute of Frauds to defendants' alleged promises of financial accommodation and plaintiff's failure to meet the writing requirement contained therein, we find no error in the District Court's grant of summary judgment on plaintiff's contract claims.[8]

---

**8.** *In light of the dissent's repeated statements that the mechanics of F & M's account are unclear from the record and that the District Court's grant of summary judgment was premature, see* dissenting opinion at pp. 913, 916 & n. 5, 919, we are somewhat confused by the dissent's suggestion that the Court certify the question of whether the promises as alleged were promises of financial accommodation. If we were to certify this question to the Michigan Supreme Court, the Michigan Supreme Court would be in no better position than we are to interpret the applicability of the Michigan Statute of Frauds to the promises alleged in this case. In addition, although Judge Matia characterizes his opinion as a dissent, whether his opinion is truly a dissent or a concurrence turns on his resolution of the contractual intent and consideration issues, for a finding of no contractual intent or of no consideration would dictate an affirming the District Court's decision.

#### D. Promissory Estoppel

Next, plaintiff claims that the District Court erred by failing to consider its promissory estoppel argument. Plaintiff raises its promissory estoppel claim only in the consideration context, claiming that its travel from Memphis to Detroit was consideration for defendants' promise to certify the checks or to make the funds represented by the checks otherwise available.[9] To the extent that plaintiff claims that defendants' promises induced Schering–Plough to travel to Detroit to obtain certification and open an account with NBD, the District Court did address plaintiff's argument and found that that trip was not a bargained for exchange, but instead merely a prerequisite for NBD to consider certification or to open the account.[10] Nonetheless, because the Michigan Statute of Frauds bars enforcement of the alleged agreements, we need not address whether plaintiff's travel from Memphis to Detroit was consideration for the alleged agreements.

#### E. Breach of Duties of Good Faith and Fair Dealing

█ Finally, Schering–Plough argues that the District Court's finding that it failed to state a cause of action for defendants' breach of the duties of good faith and fair dealing was erroneous. Schering–Plough has conceded that if there are no underlying enforceable agreements, then its claim of breach of the duties of good faith and fair dealing must also fail. Because we find that the alleged agreements are not enforceable, defendants are entitled to summary judgment on plaintiff's claim alleging breaches of the duties of good faith and fair dealing.

#### III. Conclusion

For the reasons stated, we AFFIRM the decision of the District Court.

MATIA, District Judge, dissenting.

The majority holds that the transactions under review in this case, NBD's alleged promises to either certify or issue cashier's checks for checks presented to it by Schering–Plough, constitute financial accommodations within the meaning of the Michigan Statute of Frauds, MICH. COMP. LAWS § 566.132(2) (as amended January 1, 1993). Because I am neither comfortable with the ground on which the majority opinion is built, nor confident in the ultimate conclusion it reaches, I dissent.

The majority reasons first that degree of risk is the determining factor in understanding which transactions, in addition to those that are specifically enumerated, the statute is intended to reach. They conclude from this premise that the transactions at issue in the instant case involve the type of risk contemplated by the statute.

As an initial matter, I believe that the record in this case as developed below is insufficient to resolve at least some of the questions presented on appeal. To the extent that a sufficient record does exist to answer other legal issues that are raised, I find the majority's opinion to be a plausible, but not persuasive attempt to resolve them. Accordingly, I would remand this case with instructions directing the District Court to develop the record in the areas highlighted below.

In addition, because this Court has been unable to identify any judicial decision from Michigan interpreting the amended version of the statute at issue in this case, I would prefer to certify the legal issues presented to the Michigan Supreme Court, and allow that body to clarify the law of its state in the interest of judicial federalism. The certification procedure allows federal courts that are faced with novel issues of state law to certify a legal question to a state's highest court for resolution. The mechanism preserves state sovereignty by allowing state courts, rather

---

9. Plaintiff does not allege that it failed to pursue other opportunities to convert the checks to cash because of defendants' alleged promises to issue cashier's checks, to certify the checks, or to make the funds represented by the checks available. Nor does plaintiff's complaint include a count claiming that defendants were promissorily es-

topped from refusing to certify the checks or from refusing to make the funds available.

10. Plaintiff does not claim entitlement to travel expenses associated with its employee's travel from Memphis to Detroit.

than those of the federal government, to determine essential questions of state law and state statutory interpretation.[1] I would recommend that the following question be certified to the Michigan Supreme Court once the record is complete: "Is a financial institution engaging in a 'financial accommodation,' as that term is used in the Michigan Statute of Frauds, MICH. COMP. LAWS § 566.132(2) (as amended January 1, 1993), when it either certifies or issues a cashier's check for a check drawn on a controlled disbursement account and presented to the financial institution?"

## I.

MICH. COMP. LAWS § 566.132(2) as amended provides, in pertinent part, that:

An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:

(a) A promise or commitment to lend money, grant or extend credit, or make any other *financial accommodation.*

(Emphasis added.) This provision was intended to protect financial institutions against allegations of oral promises to engage in certain transactions. The majority holds, as did the Court below that the transactions under review constitute financial accommodations *within the meaning of the statute.*[2]

"A district court engages in statutory construction as a matter of law, and we review its conclusions *de novo." United States v. Brown,* 915 F.2d 219, 223 (6th Cir.1990). The term "financial accommodation" is not defined by the Michigan Statute of Frauds, nor is its meaning clear from the context in which it is used. It is therefore appropriate to look to the legislative history for guidance. *Arbour v. Jenkins,* 903 F.2d 416, 421 (6th Cir.1990); *In re Brzezinski,* 214 Mich.App. 652, 542 N.W.2d 871, 877 (1995). The legislative analysis accompanying Michigan House Bill 5968, which amended the Michigan Code effective January 1, 1993, and which has now become the focus of this case, describes a number of instances in which banks were subjected to lawsuits based on alleged oral representations that they would extend credit. Supporters of the bill argued that "suits to enforce a promise or commitment **to extend credit** should not be allowed unless the alleged promise or commitment [is] in writing." (Emphasis added.) The bill was therefore intended to prevent suits against banks "in which the plaintiff alleges an oral agreement or offer **to extend credit or loan money.**" (Emphasis added.) House Legislative Analysis Section, Financial Institution Commitments, House Bill 5968 (12–7–92). Nowhere does the legislative history expressly or even impliedly contemplate inclusion of the types of transactions at issue in this case.

Other courts have already considered the meaning of statutes employing the same or

---

1. Michigan has adopted a certification procedure through its Court Rule 7.305(B)(1) which provides that:

When a federal court or state appellate court considers a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may on its own initiative or that of an interested party certify the question to the Michigan Supreme Court.

2. The bulk of the majority opinion is devoted to the first and second alleged agreements between Schering–Plough and NBD, in which NBD contracted to certify Schering–Plough's checks or issue cashier's checks for them. Schering–Plough also contends that on Friday, December 2, NBD agreed to accept deposit of the checks into a new account that Schering–Plough would

open, and to transfer the funds represented by the checks into the new account provided that the funds were available in F & M's account at mid-day on Monday, December 5.

As to that agreement, the majority holds that "because defendant's alleged agreement to make the funds represented by the checks available in plaintiff's newly-opened account by mid-day December 5 also falls within the meaning of financial accommodation, we conclude that it too is unenforceable absent a writing." To the extent that the majority supports this conclusion with reasoning beyond that which it uses in ruling on the other two agreements, it is not evident in the text of their opinion. I would treat the December 5 agreement as another commitment by NBD to advance funds, and recommend the same disposition I have suggested for the other alleged agreements.

similar language and have uniformly held that the term "financial accommodation" refers only to transactions in the nature of loans or extensions of credit. For example, when analyzing the meaning of the term in the Bankruptcy Code, where it is similarly undefined, the Eleventh Circuit Court of Appeals held that "the term 'financial accommodations' should be construed to mean 'the extension of money or credit to accommodate another.' ... Thus, courts define the term 'financial accommodation' narrowly...." *Citizens & S. Nat'l Bank v. Thomas B. Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.),* 969 F.2d 1013, 1019–20 (11th Cir. 1992). In support of its conclusion, the Eleventh Circuit relied on extensive authority including *Collier on Bankruptcy* and numerous bankruptcy courts throughout the country. *Id.* at 1018, 1019 n. 7.

The Ninth Circuit has also recognized that "[t]he term 'financial accommodation' has been defined as the extension of money or credit to accommodate another." *Transamerica Commercial Finance Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.),* 945 F.2d 1089, 1092 (9th Cir.1991) (citing *In re Placid Oil Co.,* 72 B.R. 135, 139 (Bankr. N.D.Tex.1987)). I am conversely unaware of any court or commentator, and none has been cited, that endows the term "financial accommodation" with an expansive scope akin to that which the majority adopts today.

Further evidence of the legislature's intent may be drawn from related Michigan statutory provisions. In *Brown v. Yousif,* 198 Mich. App. 667, 499 N.W.2d 446, 449 (1993), *vacated in part on other grounds,* 445 Mich. 222, 517 N.W.2d 727 (1994), the Michigan judiciary recognized the intent of its legislature that the UCC regulate comprehensively the areas of law with which it deals. The court cited

MICH. COMP. LAWS § 440.1104, a preliminary section of that state's version of the Code:

> This act being a general act intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can be reasonably avoided.

The *Brown* court interpreted this provision broadly, to prohibit "any implied amendments of the Uniform Commercial Code...." *Brown,* 499 N.W.2d at 449. This Court should not, therefore, imply an intent to supersede the Uniform Commercial Code's ("UCC") ability to regulate the areas that it was designed to occupy, absent a clear manifestation of such intent from the legislature.

The UCC itself contains a Statute of Frauds. MICH. COMP. LAWS § 440.2201. Article 4 of the Code regulates the conduct of banks and their customers, and Article 3 more generally regulates commercial paper. Because these matters are already governed by the UCC, the majority's broad interpretation of § 566.132(2) would in effect constitute an amendment to the Code.[3] The legislature manifested no clear intention to make such a change, and the surrounding law and circumstances strongly suggest that they did not so intend. Instead, the legislative history behind § 566.132(2), the use of the term "financial accommodation" in other statutes, and the plain meaning of related statutory provisions in Michigan that treat the same subject matter suggest strongly—if they do not compel the conclusion—that the transactions at issue were not intended to be within the purview of the Michigan Statute of Frauds.[4]

## II.

Even if the majority is correct in concluding that the scope of the term "financial accommodation" depends entirely on the risk

---

**3.** The majority contends that the UCC does not specifically address oral promises of the type involved in this case, and that the statutory amendment at issue is not therefore an invalid amendment to that document. However the UCC is "intended as a unified coverage" of this subject matter, making its impact on other commercial law regulation roughly analogous to the preemptive effect of legislation designed to occupy an entire area of law. The way to make a change in that law is by amendment, not by the passage of separate legislation, whether or not the preempting law itself addresses specifically

the contingency that is the subject of the new law.

**4.** The majority argues that exclusion of the transactions under review from the reach of § 566.132(2) would render the "financial accommodation" language therein superfluous. However, the fact that these particular transactions should be excluded in no way forecloses the possibility that others may appropriately be included.

assumed by a bank in performing a particular transaction, its holding that the alleged agreements in this case are subject to the statute is dubious. The majority contends that the risk of loss to NBD arises from the nature of the "controlled disbursement account" maintained by F & M. The manner in which that account operates is not clear either from the record or from the memoranda submitted by the parties.[5] However, the majority proceeds from the assumption that F & M had enhanced rights to determine whether or not it would pay checks presented on its account, such that NBD would not have known at the time of committing its funds whether F & M would cover the checks. The majority asserts that had NBD assumed primary liability on the checks (which would have been the result of certification or the issuance of cashier's checks), and had F & M later refused to cover them, NBD would have been without recourse to recover the amount of the checks. The majority contends that this perceived risk of loss brings the transactions at issue within the reach of the statute.

As mentioned earlier, the exact nature of the account rights held by F & M is unclear. In its brief to this Court, NBD explains that F & M could "monitor their account and (to) place its own stop payment orders on line from its own place of business." However, to the extent that F & M's right not to cover a check does take the form of a stop payment order,[6] Michigan's UCC provides banks such as NBD with ample protection against loss arising under these circumstances.

### A.

Section 440.4407 of the UCC provides banks with rights of action against certain parties to transactions involving the payment of checks subject to stop orders:

> If a payor bank has paid an item over the order of the drawer or maker to stop payment ... or otherwise under circumstances giving a basis for objection by the drawer or maker ... the payor bank is subrogated to the rights
>
> (b) of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose; and
>
> (c) of the drawer or maker against the payee....

Stop payment orders may be classified in one of two ways: Those that issue rightfully, as when the customer/drawer has a valid legal reason for ordering its bank not to pay a check the customer/drawer has issued, and those that are wrongful, as when a customer/drawer issues a stop order but has no legal right to avoid the underlying obligation represented by the check.[7] In the first situation, let us assume that NBD had certified the checks or issued cashier's checks, and that F & M had later placed stop orders on the checks for good cause (e.g., F & M learned that the consideration provided by Schering–Plough in exchange for the checks had failed in some manner). MICH. COMP. LAWS § 440.4207 provides in pertinent part that:

> (a) A customer or collecting bank that transfers an item and receives a settlement or other consideration warrants to the transferee and to any subsequent collecting bank that:

incur the cost of a stop order rather than simply availing itself of this other contractual mechanism.

---

**5.** This uncertainty is not surprising, given the fact that the court below granted summary judgment in favor of NBD prior to the *commencement* of discovery. It does, however, demonstrate further that the granting of summary judgment was premature.

**6.** The court in *RPM Pizza, Inc. v. Bank One Cambridge*, 869 F.Supp. 517, 518–19 (E.D.Mich. 1994), recounts a situation where a controlled disbursement account holder issued a stop order for a check it had written. If another mechanism is readily available under such accounts, as the majority apparently believes, one must wonder why the customer in *RPM Pizza* chose to

**7.** The only difference between a stop order issued by a controlled disbursement account holder and any other customer is timing. In the former case, the bank effectively agrees to waive the protection of MICH. COMP. LAWS § 440.4403, that would otherwise allow it to disregard such an order not received within a reasonable time prior to the bank's decision to commit funds for a check.

(4) the item is not subject to a defense ... of any party that can be asserted against the warrantor....

It is true that, had NBD paid the checks over F & M's rightful stop payment order, it would have been liable to F & M for the amounts deducted from its account. However, according to NBD's right of subrogation under MICH. COMP. LAWS § 440.4407(c), NBD could then have stepped into the shoes of F & M and sued Schering–Plough to recover the funds advanced, either for a breach of Schering–Plough's § 440.4207(1)(d) transfer warranty, or on the underlying transaction from which the checks arose.

In the second situation described above, assume that NBD had certified the checks or issued cashier's checks, and that F & M had later issued a stop payment order without good cause to do so. NBD *may* still have been liable to F & M for paying the checks over the stop order, MICH. COMP. LAWS § 440.4403.[8] In any event, F & M would have had reciprocal liability back to NBD, which under § 440.4407(b) would have been subrogated to Schering–Plough's right to obtain payment on F & M's underlying obligation to Schering–Plough. Accordingly, be-

cause NBD would have had a forthright remedy under the UCC to recover any funds it advanced to Schering–Plough under either scenario, the risk to NBD identified by the majority is largely illusory in character. It therefore fails under the majority's own "risk of loss" test to justify inclusion of the transactions at issue within the Statute of Frauds.

**B.**

The majority contends that another mechanism exists by which controlled disbursement account holders may refuse to fund checks that they issue. By way of background, a controlled disbursement account holder receives a report of the checks presented on its account during a given business day, and then transfers funds to its checking account from some other source—either a line of credit extended by the bank, or a separate funding account—in an amount equal to sum of the checks presented. It is not entirely clear whether this transfer is effected affirmatively by the customer, by the bank, or whether it is simply an electronic procedure that operates without any direct action from either party.[9] Thus, for the ma-

---

8. In order for a customer to force a bank to recredit its account after paying over a stop order, MICH. COMP. LAWS § 440.4403(3) places "the burden of establishing the fact and amount of loss ... on the customer." This language has resulted in conflicting court decisions as to exactly what the customer must prove in order to force the bank to recredit. A majority of courts have held that a customer must demonstrate (or the bank must demonstrate the absence of) a loss to the customer beyond the debiting of the account, *i.e.*, a "real" loss. Under that theory, if the drawer is actually liable to the payee of the check, the bank's payment of the check caused no real detriment to the drawer and the customer cannot force the bank to recredit. *See, e.g., Dunnigan v. First Bank*, 217 Conn. 205, 585 A.2d 659, 662 (1991) (citing cases). Other courts have held that the customer carries its § 440.4403(3) burden merely by demonstrating the existence of a formally correct and timely stop order. *See, e.g., Hughes v. Marine Midland Bank*, 127 Misc.2d 209, 484 N.Y.S.2d 1000, 1004 (N.Y. 1985) (citing cases).

9. For example, the account under review in *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir.1987) operates under the first method: The bank "notified [the drawer] every business day of the total amount of

checks cleared through the account that day, and [the drawer] wired a transfer of funds for that amount to [the bank] the same day."

John G. Edwards discusses an arrangement conforming to the second alternative in *BofA Practice Examined*, The Las–Vegas Review–Journal, June 19, 1994: "First Union notifies Bank of America Nevada of the amount. Bank of America withdraws funds from the customer's line of credit, interest-bearing account or investment for the exact amount and wires the funds to First Union for the local customer."

Finally, it should be recognized that modern banking realities dictate that a vast majority of transactions are automated, and that human review is often entirely absent. It is therefore possible, given the lack of information in the record, that the funds are simply transferred from one source to another with the touch of a button and without any customer involvement whatsoever.

Even to the extent that a customer is actually involved in the fund transfer process, the foregoing authorities suggest that the customer is notified only of the total amount of all checks clearing on a given day. The customer would consequently be unable to selectively refuse to fund certain checks, except through the normal means of a stop payment order. This would not be a surprising result, since the customer's main

jority to assume that a customer has the ability to prevent the transfer of funds seems unwarranted. But even assuming that the majority's assumption is correct does not conclude the inquiry.

In order for the majority's position to prevail, its contention that a controlled disbursement account holder "has the discretion to fund checks after they [are] presented for payment," and presumably the discretion not to fund them, would also need to withstand scrutiny. I am unaware of any evidence suggesting that either F & M or any other such account holder has this type of discretion. Certainly nothing in the record of this case suggests it. To hold that banks and corporate entities are unable either to rely on checks backed by fully funded accounts,[10] or to make business decisions based on the fact that such checks will be paid as a matter of course, is fundamentally at odds not only with my understanding of modern commercial practice, but also with the letter and spirit of the UCC sections discussed above. The information marshaled by this Court on the topic of controlled disbursement accounts reveals that at best the holder of such an account has the *power* to refuse to transfer funds to cover a check it has voluntarily issued—it does not have the legal *right* to do so. Surely the bank would have a cause of action against such a customer either for a breach of the customer's contractual duty to fund the account, (if such a duty existed, which is again unclear given the incomplete

state of the record), or through subrogation to the payee's rights on the underlying debt evidenced by the checks (pursuant to MICH. COMP. LAWS § 440.4407(c)).

Whether a controlled disbursement account holder must issue a stop payment order to avoid paying checks that it has written, or whether it can simply refuse to fund its checking account, a bank will ultimately have a simple and straightforward recourse against the customer to recover any funds represented by the customer's checks on which the bank assumes liability. The majority's perception of NBD's potential exposure, and their parallel failure to appreciate the remedies at the bank's disposal, cut at the heart of the rationale that underpins the majority's ultimate conclusion.

### III.

The certification and cashier's check situations at issue in this case are dramatically different from the two transactions explicitly embraced by the statute. When a bank decides to make a loan or to extend credit, it does so as a matter of business judgment. It determines that the benefit it will receive in the form of fees collected and goodwill and reputation built with its current and potential customers outweighs the risk that its customer will default on the loan or prove unworthy of the credit. Successful banks make these judgments correctly in the aggregate, and thereby enhance both their profit margins

concern is maximizing the funds it has available for other purposes, not inventing ways to escape from under its clear commercial obligations. John G. Edwards, *Fed Rejects Complaint Against Bank*, The Las–Vegas Review–Journal, Aug. 6, 1994. There is no reason to believe that a customer would desire or bargain for the ability (or obligation) to review check list reports on a daily basis, so long as its funds are optimally invested.

**10.** The majority raises the possibility that F & M's account may have been without sufficient funds to cover the checks presented to NBD, either as a result of its intentional depletion by F & M, or for some other reason. They analogize this situation to an individual checking account, in which the holder could simply withdraw all of his funds to avoid paying a check he has issued. Again, the majority speculates as to the nature of the contract between NBD and F & M, assuming the absence of any provision requiring F & M to

fund its checking account. Furthermore, the record indicates that during the negotiations preceding at least the first two alleged agreements, NBD officials told Schering–Plough employees that F & M had sufficient funds deposited with NBD to cover the check amounts.

Finally, the majority recognizes that the payor of a check (F & M) would be liable to the payee (Schering–Plough) under these circumstances. In addition, however, had NBD advanced funds to Schering–Plough, NBD would have been subrogated to Schering–Plough's rights against F & M by operation of MICH. COMP. LAWS § 440.4407(b). NBD would therefore have had one or more direct rights of action against F & M had it advanced funds to Schering–Plough. It is also possible, given the funds that F & M had deposited with NBD, that NBD could have exercised its right of setoff to recover any funds advanced, without even resorting to judicial process.

and their reputations. However, a risk of loss is inherent in these types of transactions, and it is a risk that banks weigh scrupulously when deciding whether to engage in them. The intent of the statute is to allow banks to minimize this risk.

Certifying checks and issuing cashier's checks, conversely, are not services that inherently involve substantial risk. As discussed above, banks are protected by the UCC against the uncertainty of these endeavors for that very reason. The fact that the UCC does not contain comparable mechanisms to protect banks against the risk of loss in loan or credit transactions underscores the distinction.

All transactions involve some risk, but not all transactions are within the scope of the statute. For example, when an individual claiming to be a customer enters a bank and asks to make a withdrawal from his or her account, the bank may ask that the individual display identification, or compare his or her signature with the customer's signature on record. However, the bank has no ironclad guarantee that the identification is not falsified, or that the signature is not forged. The bank is consequently at some risk when it advances funds, but no one would seriously argue that a simple over-the-counter withdrawal represents a financial accommodation within the meaning of the Statute of Frauds.

## CONCLUSION

I therefore disagree with the majority's disposition of this case in two ways: First, I do not believe that the record as developed below affords a sufficient basis for resolving the issues surrounding the operation of F & M's account. These issues are critical to a well-reasoned resolution of the questions presented to this Court on appeal. I would therefore remand this matter to the District Court and allow it to develop a sufficient record before any court attempts to render

the legal determination that both myself and the majority appear to agree is required.

Second, once such a record is established, I would suggest that the Michigan Supreme Court, rather than this body, should have the first opportunity to interpret a statute drafted by the legislature of its own state.

For the foregoing reasons, I dissent.[11]

---

**11.** I recognize that the Court below also found that the alleged contracts were invalid for either a lack of contractual intent as to their formation, or the absence of consideration to support NBD's alleged promises to Schering–Plough. I believe that the Court below erred in these conclusions, and that at least the second and third agreements constituted valid contracts in their entireties.

However, given the fact that the majority does not discuss these issues, and the fact that my proposed disposition of this case would likely either resolve it entirely or place it ultimately back before this Court for further proceedings, I believe that a detailed discussion of contractual intent and consideration would be an inappropriate use of judicial resources at this time.